BENAVIDES, Circuit Judge,
writing for the Court except as to Parts II.A.1-3. JERRY E. SMITH, Circuit Judge, writing for the Court in Parts II.A.1-3[1].
This is a direct appeal in a federal death penalty case. Sherman Fields challenges his seven convictions and his death sentence, claiming more than twenty different errors. For the reasons below, we reject all of Fields’s claims of error and, accordingly, affirm his convictions and sentences.

I. BACKGROUND

The evidence presented at trial reveals the following: Fields was arrested on federal firearms charges in September 2001. He was held in federal custody at the McClennan County Detention Center in Waco, Texas. In November 2001, Fields bribed a correctional officer — paying him $5000 in exchange for a key to the detention center’s fire escape door. Using the key, Fields escaped.
After fleeing federal custody, Fields met up with a friend. Through this friend, Fields obtained a car and a .32 caliber revolver. That evening, Fields visited his ex-girlfriend, Suncerey Coleman, at Hill-crest Hospital in Waco, where she was attending to her newborn baby. Fields was angry with Coleman for seeing other men. After Fields and Coleman conversed for some time, Fields convinced her to leave the hospital with him. They drove to Downsville, Texas, a small town just outside of Waco. The two had sexual intercourse,[2] and then Fields shot Coleman *324 twice in the head. After that, he dragged her dead body from the road into some underbrush to hide it.
Several days later, Fields approached a Hillcrest Hospital employee, Tammy Edwards, while Edwards was exiting her car. Brandishing a handgun and grabbing her by the throat, Fields demanded that Edwards get back in the car. Although Edwards was able to struggle free, Fields managed to wrestle away her car keys. Fields drove away in Edwards’s car.
Coleman’s body was found on November 21, more than two weeks after her death. Three days later, police rearrested Fields. The Government charged Fields by a seven-count indictment with (1) conspiring to escape from federal custody, (2) escaping from federal custody, (3) using and carrying a firearm during and in relation to escape, resulting in intentional murder, (4) carjacking, (5) using and carrying a firearm during and in relation to carjacking, (6) felon in possession of a firearm, (7) using and carrying a Ruger .22 caliber firearm during and in relation to escape.
At trial, Fields asked to represent himself. The district court advised against such a course of action. After Fields insisted, the court instructed his two previously-appointed attorneys to act as standby counsel. Following several days of evidence, the jury convicted Fields on all counts.
The Government sought a death sentence on the murder count pursuant to 18 U.S.C. § 924{j)(l).[3] At his separate trial on sentencing,[4] Fields waived his right to proceed pro se and was represented by counsel. Fields objected on Confrontation Clause grounds to the admission of certain out-of-court statements to establish that Fields committed prior violent crimes. After hearing additional evidence, the jury recommended the death penalty. Following this recommendation, the court sentenced Fields to death. Fields appealed, challenging his convictions and his death sentence.

II. DISCUSSION

While Fields raises a variety of potential trial errors, his more substantial claims concern the sentencing phase of trial. At the expense of a chronological account of the trial proceedings, we begin by addressing the sentencing issues before turning to the potential trial errors.

A. CLAIMS OF SENTENCING ERROR

1. CONFRONTATION

Fields maintains that the district court erred by admitting testimonial hearsay at his capital sentencing proceeding in violation of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Fields preserved this purely legal claim of error at sentencing, so our review is de novo.

a. The Nature of the Confrontation Clause Challenge

Fields challenges, on the basis of the Confrontation Clause, the introduction at sentencing of several hearsay statements of five types: (1) statements made about him by his mother and juvenile probation officers in various records intro *325 duced into evidence by a Juvenile Probation Department official; (2) statements made about him by corrections officers in prison records introduced into evidence by state prison officials; (3) statements made by officers in police reports introduced into evidence by someone other than the officer who had made the report; (4) a detective’s description, based on the investigating officer’s report, of the drive-by shooting that led to Fields’s 1992 conviction of attempted murder; and (5) statements made by witnesses to police officers while the officers were investigating various past crimes in which Fields may have been involved but for which he was never charged (the statements being described in the officers’ testimony).
None of the challenged statements was presented as part of the government’s effort to establish the statutory aggravating factors that trigger death-eligibility under the Federal Death Penalty Act (“FDPA”). See 18 U.S.C. § 3592(c). Indeed, the statements are not in any way relevant to the eligibility-triggering factors included in the government’s Notice of Intent To Seek a Sentence of Death. Those factors are (1) that Coleman’s death occurred during Fields’s commission of (or immediate flight from the commission of) an escape in violation of 18 U.S.C. § 751; (2) that Fields had been convicted of a federal or state offense punishable by imprisonment for more than one year, involving the use, attempted use, or threatened use of a firearm; and (3) that he had committed the offense after substantial planning and preparation to cause the death of another.[5] Rather, all of the challenged statements were introduced as part of the government’s effort to establish Fields’s past violent conduct and future dangerousness, both of which are nonstatutory aggravating factors that were included in the government’s notice.[6]
The establishment of nonstatutory aggravating factors is neither necessary nor sufficient to authorize imposition of the death penalty. Nonstatutory aggravating factors may be considered by the jury in selecting an appropriate sentence once a defendant is found eligible for the death penalty, but they are not, and cannot be, used to determine that eligibility, -as the Supreme Court has explained:
[Statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death.
Zant v. Stephens, 462 U.S. 862, 878, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).
Because they relate only to nonstatutory aggravating factors, the hearsay statements challenged by Fields are relevant only to the jury’s selection of an appropriate punishment from within an authorized range and not to the establishment of his eligibility for the death penalty. After reviewing the applicable caselaw and considering the particular importance of “indi *326 vidualized sentencing” in capital cases, we conclude that the Confrontation Clause does not operate to bar the admission of testimony relevant only to a capital sentencing authority’s selection decision.[7]

b. Constitutional Rights at Capital Sentencing: Williams v. New York

Constitutional rights traditionally have been more circumscribed at sentencing, even capital sentencing, than during the guilt phase. In Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), a state judge sentenced a defendant to death on the basis of information obtained pursuant to a statutory presentence investigation and relayed to the judge outside the courtroom. At the sentencing hearing, the judge explained why he believed the death penalty was appropriate:
[The judge] stated that the pre-sentence investigation revealed many material facts concerning appellant’s background which though relevant to the question of punishment could not properly have been brought to the attention of the jury in its consideration of the question of guilt. He referred to the experience appellant “had had on thirty other burglaries in and about the same vicinity” where the murder had been committed. The appellant had not been convicted of these burglaries although the judge had information that he had confessed to some and had been identified as the perpetrator of some of the others. The judge also referred to certain activities of appellant as shown by the probation report that indicated appellant possessed “a morbid sexuality” and classified him as a “menace to society.”
Id. at 244, 69 S.Ct. 1079.
The defendant challenged his sentence on due process grounds, stating that his constitutional rights had been violated because “the sentence of death was based upon information supplied by witnesses with whom the accused had not been confronted and as to whom he had no opportunity for cross-examination or rebuttal.” Id. at 243, 69 S.Ct. 1079. The Supreme Court rejected the challenge, holding that a judge, consistent with due process, could sentence a defendant on the basis of information untested in open court. “[P]ossession of the fullest information possible concerning the defendant’s life and characteristics” was “essential” to a judge’s selection of an appropriate sentence, and therefore
we do not think the Federal Constitution restricts the view of the sentencing judge to the information received in open court. The due-process clause should not be treated as a device for freezing the evidential procedure of sentencing in the mold of trial procedure. So to treat the due-process clause would hinder if not preclude all courts state and federal from making progressive efforts to improve the administration of criminal justice.
Id. at 247, 251, 69 S.Ct. 1079. The Court was urged to “draw a constitutional distinction as to the procedure for obtaining information where the death sentence is imposed,” but it explicitly refused to do so. Id. at 251, 69 S.Ct. 1079.
*327 Williams is a due process, rather than Sixth Amendment, case and therefore does not dictate the result of Fields’s Confrontation Clause challenge. We conclude, however, that Williams’s distinction between guilt and sentencing proceedings and its emphasis on the sentencing authority’s access to a wide body of information in the interest of individualized punishment is relevant to our Confrontation Clause inquiry. Included in the notion that information influencing a sentencing decision need not be introduced in open court is the idea that defendants have no confrontation right at that phase and therefore that testimonial hearsay is not per se inadmissible. Indeed, the Court referred to the rights to confront and cross-examine as “salutary and time-tested protections” included within the due process guarantee but available only “where the question for consideration is the guilt of the defendant.” Id. at 245, 69 S.Ct. 1079.[8]
c. Continuing Relevance of Williams
If we adhere to the logic of Williams, Fields’s Confrontation Clause challenge must fail. The dissent, however, posits that Williams is irrelevant to the issue at hand because it is not explicitly a Sixth Amendment case and because the Williams Court “supposed that there was no ‘constitutional distinction’ between capital sentencing and ordinary sentencing.” Now that later decisions have suggested that “death is different,” the dissent takes the position that Williams has nothing to offer on the question of the admissibility of evidence at capital sentencing. We disagree.

i. Williams’s Status as a Due Process Case Does Not Preclude Its Relevance

Although it did not do so under the guise of the Sixth Amendment, the Williams Court plainly discussed the right of confrontation. Furthermore, even in the wake of the Supreme Court’s incorporation of the Sixth Amendment against the states and its application of some, but not all, Sixth Amendment rights at sentencing, see infra, Williams has never been overruled.[9] In fact, the Court continues to cite Williams for the proposition that there are *328 no per se constitutional prohibitions on the introduction of hearsay at sentencing.[10]
These decisions discuss Williams, and the constitutional limitations on the scope and type of information a sentencer may consider, under the umbrella of due process rather than the Sixth Amendment. This circumstance may be significant: In ruling that the enactment of the Sentencing Guidelines did not transform ordinary sentencing into a separate criminal proceeding, requiring, under Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), that a defendant be accorded the full panoply of trial rights, the Eighth Circuit stated the following:
We recognize that Williams v. New York, Williams v. Oklahoma[, 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959)], and Specht all considered the application of the right to confront witnesses under the rubric of the Due Process Clause of the Fourteenth Amendment, [but] ... we note that Specht was decided after the Sixth Amendment’s Confrontation Clause was found applicable to the States via the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 ... (1965). That the Supreme Court analyzed the right of confrontation both before and after Pointer as an issue of due process suggests that due process, not the Confrontation Clause, provides the relevant framework for testing the use of hearsay testimony at a sentencing proceeding. Other courts have relied on a due process analysis rather than the Confrontation Clause when considering the right of confrontation at sentencing. See, e.g., United States v. Berzon, 941 F.2d 8, 16-21 (1st Cir.1991); United States v. Castellanos, 904 F.2d 1490, 1495-96 (11th Cir.1990); United States v. Carmona, 873 F.2d 569, 574-75 (2d Cir.1989); United States v. Richards, 784 F.Supp. 1373, 1377-78 (N.D.Ind.1992).
United States v. Wise, 976 F.2d 393, 398 n. 2 (8th Cir.1992) (en banc) (emphasis added). More recently, in holding that Crawford does not apply at sentencing, the Seventh Circuit has stated that “the relevant provision at sentencing is the Due Process Clause, not the confrontation clause; Williams shows that witnesses providing information to the court after guilt is established are not accusers within the meaning of the confrontation clause.” United States v. Roche, 415 F.3d 614, 618 (7th Cir.), cert. denied, — U.S. -, 126 S.Ct. 671, 163 L.Ed.2d 541 (2005).[11]

ii. Gardner v. Florida

Perhaps more importantly, Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), a post-incorporation decision regarding procedural requirements at capital sentencing, establishes that Williams remains relevant in the capital sentencing context. In Gardner, a plurality held that a defendant cannot be sentenced to death on the basis of informa *329 tion undisclosed to a defendant and contained in a presentence investigation report because, to satisfy due process, a capital defendant must be given a chance to rebut or explain adverse information introduced at sentencing. Id. at 362, 97 S.Ct. 1197. At first blush, this ruling appears to call the core holding of Williams into doubt. Any characterization of Gardner as a Williams-killer and a harbinger of the application of the confrontation right at capital sentencing would be misplaced, however, for at least two reasons.
First, Gardner, like Williams, is a due process case. Asked to examine what rights defendants have under the Due Process Clause with regard to the presentation of evidence at capital sentencing, the Court noted that defendants were entitled to effective assistance of counsel during sentencing, id. at 358, 97 S.Ct. 1197, but made no mention of a right of confrontation, lending further credence to the notion that the categorization of Williams as a pre-incorporation due process case does not vitiate its relevance to the issue with which we are faced.
Second, Gardner explicitly declined to overrule Williams and instead distinguished it, stating that “the holding of Williams is not directly applicable to this case.” Id. at 356, 97 S.Ct. 1197. “[I]n Williams the material facts concerning the defendant’s background which were contained in the presentence report were described in detail by the trial judge in open court,” affording the defendant the opportunity “to challenge the accuracy or materiality” of said facts. Id. The Gardner plurality held only that a defendant’s due process rights are abridged where he is given no similar “opportunity to deny or explain” adverse evidence, id. at 362, 97 S.Ct. 1197, and the plurality was careful to note that “[t]he fact that due process applies [at capital sentencing proceedings] does not, of course, implicate the entire panoply of criminal trial procedural rights,” id. at 358, 97 S.Ct. 1197 n. 9.
The dissent notes that the Gardner plurality also distinguishes Williams on the ground that “[t]he trial judge in Williams was not asked to ‘ “afford appellant a chance to refute or discredit any of [the statements at issue] by cross-examination or otherwise.” ’ ” Id. at 356, 97 S.Ct. 1197 (quoting Williams). As the Second Circuit has stated, however, Williams “does not turn on any concept of waiver by failure to object. It rests, rather, on the broad ground that due process does not preclude reliance on out-of-court information in imposing sentence.” United States v. Fatico, 579 F.2d 707, 712 n. 11 (2d Cir.1978).
More importantly, despite making note of the Williams defendant’s failure to object at sentencing to the denial of an opportunity to challenge the veracity of the relevant information through, inter alia, cross-examination, Gardner nowhere suggests that cross-examination of hearsay declarants in particular is necessary to satisfy due process. Gardner instead focuses solely on whether information has been disclosed to the defendant so that he can “deny or explain” it by any means.
Gardner offers no basis for assuming that cross-examination of a witness presenting hearsay evidence, for example, would not be sufficient to satisfy constitutional concerns, a fact that Professor John Douglass, whose work is cited frequently by the dissent, fully acknowledges: “The Court has never said that the right to ‘deny or explain’ sentencing information includes the confrontation rights that Williams rejected: the right to see, hear, and cross-examine the sources of that in *330 formation.”[12]
For the same reason, Smith v. Estelle, 602 F.2d 694 (5th Cir.1979), neither compels nor implies the rejection of the principles underlying Williams and the extension of the confrontation right to capital sentencing. There, we held that a defendant’s due process rights were violated by the state’s calling a psychiatrist as a surprise witness at a capital sentencing proceeding. Reasoning from Gardner, we stated that “[s]urprise can be as effective as secrecy in preventing effective cross-examination, in denying ‘opportunity for (defense) counsel to challenge the accuracy or materiality of evidence.” Id. at 699 (quoting Gardner). We never hinted, however, that providing a defendant the opportunity to question, with advance preparation, a witness presenting hearsay evidence would not satisfy due process.[13]
The decision in Del Vecchio v. Ill. Dep’t of Corr., 31 F.3d 1363, 1387 (7th Cir.1994), offers support for the proposition that the due process guarantee of an opportunity to “deny or explain” evidence does not undercut Williams’s sanction of the use of out-of-court statements at capital sentencing. In Del Vecchio, the court was faced with a capital defendant’s challenge, on Confrontation Clause grounds, to the in-court testimony of two psychiatrists “that they had perused medical reports from other psychiatrists who had examined Del Vecchio, and that the conclusions reached in those reports supported their opinions” that the defendant was a sociopath. The court held that Illinois’s statute permitting the admission of such hearsay at capital sentencing adequately protected the defendant’s constitutional rights by “providing that [defendants] ‘shall be given a fair opportunity to rebut any information received at the hearing.’” Id. at 1388. The defendant had in fact been given that opportunity, because “[h]e had access to the contested hearsay reports; he could have cross-examined Drs. Rogers and Cavanaugh about the reports; he could have called his own experts.” Id.
Based on the above, we find wholly unpersuasive the Eleventh Circuit’s extension (in reliance on Gardner and Smith) of the Sixth Amendment confrontation right through the entirety of the capital sentencing process, and we note that that circuit is the only one to have taken that step.[14] The Seventh Circuit has ruled, pursuant to Williams, that the Confrontation Clause does not apply at capital sentencing,[15] and the Fourth Circuit has expressed doubt that it does.[16]

*331
d. “Death is Different”

Expanding the scope of our inquiry beyond Gardner, the Supreme Court’s more general “death is different” jurisprudence does not call into doubt either the relevance or the persuasiveness of Williams on the question presented in the instant case. An examination of Court precedent regarding the Sixth and Eighth Amendments indicates that “at least with regard to the rights listed in the Sixth Amendment, the Court’s rules for capital sentencing are essentially the same as for noncap-ital sentencing .... When it comes to Sixth Amendment rights at sentencing, it seems, death is not so different after all.” Douglass, Confronting Death, 105 Colum. L.Rev. at 1993.

i. Application of Sixth Amendment Rights at Sentencing

Since Williams was decided, certain Sixth Amendment rights have been applied incrementally to the sentencing process, capital and noncapital. Now criminal defendants have a right to counsel throughout sentencing.[17] Likewise, they have a right to a jury finding, beyond a reasonable doubt, of any facts necessary to expose a defendant to a higher maximum penalty, including death, regardless of whether those facts are labeled “sentencing factors” rather than elements of the offense.[18]
When it comes to the ultimate selection of an appropriate punishment out of a range of available options, however, there is no constitutional right to jury sentencing in a noncapital or capital case.[19] *332 And with regard to the confrontation right, caselaw definitively maintains the Williams principle in the noncapital context and establishes that the right does not apply at sentencing. In particular, the Confrontation Clause does not operate to bar the introduction of testimonial hearsay at noncapital sentencing.[20]
Here we are asked to decide whether the confrontation right applies with full force throughout capital sentencing, despite the fact that it is nonexistent at ordinary sentencing. Given that, as shown above, no other Sixth Amendment right has been applied {vel non) differently at capital sentencing from how it is applied at noncapital sentencing, there is little reason to establish divergent rules with regard to the confrontation right when the sentencing authority is selecting a sentence from within an authorized range.
On the basis of the Supreme Court’s consistent treatment of Sixth Amendment rights across capital and noncapital cases alone, we find unpersuasive the dissent’s textual argument for why the Confrontation Clause should extend through the entirety of the capital sentencing process, in light of the fact that the jury right extends only as far as the eligibility determination. The dissent contends that
[t]he Jury Clause has a unique second limitation that does not apply to the Right to Counsel or the Confrontation Clause: only a jury “trial” is required. A jury is only required at trial, whereas both the Right to Counsel and the Confrontation Clause apply more broadly to the whole “criminal prosecution,” and thus to sentencing.
(Internal quotations and citations omitted.) This textual argument proves too much, for it would apply equally at noncapital sentencing, where it has already been established that the right of confrontation is nonexistent.[21]
The dissent’s argument in favor of the application of the Confrontation Clause *333 throughout capital sentencing based on the interplay of the right to counsel and the right of confrontation falters on similar grounds. The dissent states that “[t]he Sixth Amendment extends the rights both to counsel and to confrontation in ‘all criminal prosecutions,’ suggesting that where one right applies, the other does too.” The dissent further asserts that “[rjequir-ing confrontation in the FDPA’s trial-like sentencing regime is particularly appropriate given the interdependence of adversarial rights .... [A] meaningful Right to Counsel at capital sentencing depends on confrontation rights.” But if, as the dissent suggests, the right to counsel and the right of confrontation are adversarial tools that move in lock step, that again begs the question: Why is the confrontation right admittedly nonexistent at noncapital sentencing, even though the right to counsel plainly applies throughout such proceedings?
To address this dilemma, the dissent emphasizes that capital sentencing is “more adversarial” than is noncapital sentencing: “The Confrontation Clause should apply fully because FDPA sentencing, unlike noncapital sentencing, involves a trial-like adversarial proceeding.” For this proposition the dissent relies on Bullington v. Missouri, 451 U.S. 430, 438-39 & n. 10, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), by stating that “[t]he Supreme Court applies certain ‘trial rights’ to adversarial sentencing hearings that bear the ‘hallmarks of the trial on guilt or innocence.’ ”
Bullington, however, is a Fifth Amendment double jeopardy case, and the Court in Spaziano stated as follows:
The fact that a capital sentencing is like a trial in the respects significant to the Double Jeopardy Clause ... does not mean that it is like a trial in respects significant to the Sixth Amendment’s guarantee of a jury trial. The Court’s concern in Bullington was with the risk that the State, with all its resources, would wear a defendant down, thereby leading to an erroneously imposed death penalty. There is no similar danger involved in denying a defendant a jury trial on the sentencing issue of life or death. The sentencer, whether judge or jury, has a constitutional obligation to evaluate the unique circumstances of the individual defendant and the sentencer’s decision for life is final. More important, despite its unique aspects, a capital sentencing proceeding involves the same fundamental issue involved in any other sentencing proceeding — a determination of the appropriate punishment to be imposed on an individual .... The Sixth Amendment never has been thought to guarantee a right to a jury determination of that issue.
Spaziano, 468 U.S. at 459, 104 S.Ct. 3154 (emphasis added) (internal citations omitted). The Court’s analysis indicates that despite the “unique aspects” of a capital sentencing proceeding, it is not, with respect to the ultimate issue to be decided (the selection of an appropriate punishment), any more “trial-like” than is ordinary sentencing, where the Confrontation Clause has been held inapplicable.[22]
*334 Further to justify its proposed anomalous divergent treatment of capital and noncapital sentencing with regard to the Confrontation Clause, the dissent also relies on the history of capital murder trials, stating that “[a]t the time the Confrontation Clause was written, a capital trial was a single, unified proceeding at which both guilt and sentence were decided. The Framers knew nothing of capital sentencing proceedings separate from trial.” If one was convicted of a capital felony, one was automatically sentenced to death. According to the dissent, the trial became a “de facto sentencing proceeding” in which the jury would render a verdict in favor of a lesser crime if it did not think the death penalty was warranted. The dissent asserts that
[t]he critical point is this: because these de facto capital sentencing proceedings took the form of full criminal trials, the defendant possessed full trial rights of confrontation. However, the notion that capital sentencing might be conducted “outside of an adversarial trial” is strictly a “post-constitutional” phenomenon.
The dissent goes on to state that at the time of the Founding, “cases suggest that judges conducted noncapital sentencing in informal proceedings featuring testimonial hearsay.” Therefore, according to the dissent, “[hjistory supports constraining con *335 frontation rights in noncapital sentencing, but capital sentencing has a different history that suggests the Confrontation Clause should apply.”
This logic is flawed. The Framers did not know of an institution analogous to our capital sentencing procedure, because there was no mechanism in the trials that operated as so-called “de facto sentencing proceedings” for the exercise of discretion even after a jury determined that a defendant was eligible for the death penalty by convicting him of a capital felony. A sentencing authority’s ability to select a lesser punishment in a capital case in spite of death-eligibility is indeed a “post-constitutional” phenomenon, and nothing in the history related by the dissent explains why the presumption should not be as follows: Now that capital sentencing includes such discretion, the exercise of it should be treated in the same manner in which the Framers understood discretionary sentencing in the noncapital context to be treated with respect to the use of testimonial hearsay.
Neither the text of the Sixth Amendment nor the history of murder trials supports the extension of the Confrontation Clause to testimony relevant only to penalty selection in a capital case. Furthermore, the manner in which the Supreme Court has proceeded in applying (vel non) Sixth Amendment rights during sentencing proceedings suggests there is no distinction between capital and ordinary sentencing for Sixth Amendment purposes, and accordingly the Court provides no indication that the reasoning of Williams has been abandoned in the capital context.

ii. The Eighth Amendment

The Court’s Eighth Amendment jurisprudence likewise does not dictate that capital sentencing should be treated differently from ordinary sentencing with regard to the application of the Confrontation Clause. Rather, the Court’s emphasis on individualized sentencing in its Eighth Amendment decisions lends support to the animating principle behind Williams: When it comes to sentencing, the more information available for consideration by the sentencing authority, the more confidence we can have in the appropriateness of the sentence.
The dissent asserts that
[t]he stringent “trial-like” procedures that govern capital sentencing derive from the Supreme Court’s unique concern with reliability in death penalty cases. “In capital proceedings generally, th[e] Court has demanded that fact-finding procedures aspire to a heightened standard of reliability. This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different.” Ford v. Wainwright, 477 U.S. 399, 411, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (internal citations omitted). Confrontation is essential to reliability.
Notably absent from the passage the dissent pulls from Ford is the citation the Court uses to support the notion that capital “factfinding procedures aspire to a heightened standard of reliability.” The Ford Court pointed to Spaziano, wherein it had opined that
[t]he absence of a lesser included offense instruction increases the risk that the jury will convict, not because it is persuaded that the defendant is guilty of capital murder, but simply to avoid setting the defendant free. In Beck [v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980)], the Court found that risk unacceptable and inconsistent with the reliability this Court has demanded in capital proceedings. The goal of the Beck rule, in other words, is *336 to eliminate the distortion of the fact-finding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence. Requiring that the jury be instructed on lesser included offenses for which the defendant may not be convicted, however, would simply introduce another type of distortion into the fact-finding process. We reaffirm our commitment to the demands of reliability in decisions involving death and to the defendant’s right to the benefit of a lesser included offense instruction that may reduce the risk of unwarranted capital convictions.
Spaziano, 468 U.S. at 455-56, 104 S.Ct. 3154.
Importantly, as Spaziano indicates, where the Court discusses the need for reliability in the Eighth Amendment context, it is not talking about the appropriate sources for information introduced at sentencing or even, more generally, about the reliability of evidence. It is instead focusing on (1) the need to delineate, ex ante, the particular offenses for which death is a proportionate punishment and (2) the need for the jury to be able to consider all factors (particularly mitigating, but also aggravating) relevant to choosing an appropriate punishment once the death penalty is in play. Reliable death sentences, under the Eighth Amendment, are those that result from a sentencing scheme that guards against arbitrariness by streamlining discretion at the eligibility stage, and then allows for the exercise of wide-ranging discretion at the selection stage.
In chastising a defendant for failing to recognize the “differing constitutional treatment” accorded to the eligibility and selection phases of capital sentencing, the Court has stated that “[i]t is in regard to the eligibility phase that we have stressed the need for channeling and limiting the jury’s discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition.” Buchanan v. Angelone, 522 U.S. 269, 275, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). With regard to the selection decision, the Court in Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), stated that “[b]e-cause of [the] qualitative difference [between death and imprisonment], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.”
The Court explained that the need for greater reliability in the selection of an appropriate punishment entails not stricter evidentiary rules, but the assurance of “individualized sentencing” once a defendant is eligible for the death penalty:
Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. See Williams v. New York, 337 U.S., at 247-249, 69 S.Ct. 1079, 93 L.Ed. 1337 ...; Furman v. Georgia, 408 U.S., at 402-403, 92 S.Ct. 2726, 33 L.Ed.2d 346 ... (Burger, C.J., dissenting). While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, see Trop v. Dulles, 356 U.S., at 100, 78 S.Ct. 590 ... (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.
*337 Id. at 304, 96 S.Ct. 2978. Likewise, in Gregg v. Georgia, 428 U.S. 153, 203, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Court rejected a constitutional challenge to “the wide scope of evidence and argument allowed at presentence hearings.”
We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a hearing and to approve open and far-ranging argument. So long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision.
Id. at 203-04, 96 S.Ct. 2909.
All of this is not to suggest that eviden-tiary reliability is unimportant at capital sentencing. Rather, the salient point is that the particular reliability concern that distinguishes capital sentencing from ordinary sentencing under the Eighth Amendment is not evidentiary reliability.
Evidentiary reliability surely is important at capital sentencing, just as it is at noncapital sentencing.[23] The Supreme Court’s Eighth Amendment jurisprudence, however, does not make evidentiary reliability any more important at capital sentencing than it is at noncapital sentencing, where the Confrontation Clause does not apply.
A defendant in any sentencing proceeding must be given the opportunity to “deny or explain” the evidence against him, and Crawford does not suggest that confrontation is the only mechanism through which the reliability of testimony can be assessed. Cf. Whorton v. Bockting, — U.S. -, 127 S.Ct. 1173, 1183, 167 L.Ed.2d 1 (2007). Rather, Crawford stands for the proposition that, where the clause applies, confrontation is the only permissible method of assessing reliability:
To be sure, the Clause’s ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.
Crawford, 541 U.S. at 61, 124 S.Ct. 1354.
Our conclusion — that the Confrontation Clause is inapplicable to the presentation of testimony relevant only to the sentencing authority’s selection decision — does not doom defendants to being sentenced to death on the basis of unreliable hearsay evidence. “Although the Confrontation Clause does not apply at sentencing proceedings, this is not to say that there are no constitutional limitations on the use of hearsay evidence at such proceedings. A defendant may not be sentenced on the basis of ‘misinformation of constitutional magnitude.’ ” Wise, 976 F.2d at 402 (citing Tucker, 404 U.S. at 447, 92 S.Ct. 589). Accordingly, “[d]ue process requires that some minimal indicia of relia *338 bility accompany a hearsay statement,” United States v. Petty, 982 F.2d 1365, 1369 (9th Cir.1993), and “a significant possibility of misinformation justifies the sentencing court in requiring the Government to verify the [hearsay] information,” Fatico, 579 F.2d at 712-13.
The FDPA in particular sets up a procedural framework at capital sentencing that adequately balances (1) the requisite access to a wide range of information to achieve individualized sentences and (2) the need to protect defendants from being sentenced on the basis of “misinformation of a constitutional magnitude.” Though the FDPA states that the Federal Rules of Evidence do not apply at capital sentencing, it also provides that a defendant may rebut any information received at a hearing and must be given a fair opportunity to present argument as to the adequacy of the information presented to establish the existence of any aggravating or mitigating factor. 18 U.S.C. § 3593(c). Additionally, under the FDPA a sentencing judge may exclude information if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

e. Conclusion

Based on the foregoing, the principles underlying Williams are relevant, persuasive, and ultimately fatal to Fields’s Confrontation Clause challenge. Given the particular importance of individualized sentences in capital eases, we will not “freez[e] the evidential procedure of sentencing in the mold of trial procedure,” Williams, 337 U.S. at 251, 69 S.Ct. 1079, where, as here, challenged testimony is relevant only to a sentencing authority’s selection decision. The district court did not err in admitting the challenged statements.

£. ALLEN CHARGE

About five hours after sentencing deliberations began, the jury sent a note asking “[i]f we cannot come to a unanimous vote on either death or life imprisonment without possibility of release, what options does the court have for punishment?” The court responded, without objection, “[y]ou are instructed on page 16 of the Punishment Phase Charge of the Court as follows: ‘If you are unable to unanimously agree on either punishment option, the Court will impose punishment, which cannot be a sentence of death.’ Beyond that, I am unable to answer your question.”
Forty minutes later the jury sent a note stating that “[w]e cannot come to a unanimous agreement.” The court responded with the supplemental instruction “[p]lease continue your deliberations.” Id. Approximately one hour later the jury returned a unanimous sentence of death.
Fields claims the supplemental instruction, to which he did not have the opportunity to object in the district court, impermissibly coerced a verdict of death. We review for abuse of discretion supplemental instructions telling a jury to continue deliberating. See United States v. Straach, 987 F.2d 232, 243 & n. 13 (5th Cir.1993).
In Allen v. United States, 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528 (1896), the Court stated that “[t]he very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves.” If a jury is having difficulty reaching a unanimous verdict, it is permissible to instruct it
that in a large proportion of cases absolute certainty could not be expected; that, although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of *339 his fellows, yet they should examine the question submitted with candor, and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other’s arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, on the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.
Id. Any similar supplemental instruction that urges members of a deadlocked jury to forego their differences is now known as an “Allen charge,” or “the dynamite charge, the third degree instruction, the shotgun instruction, or the nitroglycerin charge.” United States v. Bailey, 468 F.2d 652, 666 (5th Cir.1972). This “standard supplemental instruction has been well-received by the nation’s trial court judges. The charge is used precisely because it works, because it can blast a verdict out of a jury otherwise unable to agree that a person is guilty.” Id.
Fields contends that the instruction “[pjlease continue your deliberations” is impermissible because it contained none of the protective language of the traditional Allen charge, telling jurors not to forego their conscientiously-held views. The government contends, to the contrary, that the supplemental instruction is permissible because it contains none of the “dynamite” language of the traditional Allen charge, urging minority jurors to reconsider their views. In the absence of “dynamite” language, the government asserts, protective language is unnecessary.
We “scrutinize the Allen charge for compliance with two requirements: (1) the semantic deviation from approved Allen charges cannot be so prejudicial to the defendant as to require reversal, and (2) the circumstances surrounding the giving of an approved Allen charge must not be coercive.” United States v. Lindell, 881 F.2d 1313, 1321 (5th Cir.1989) (internal citations and quotations omitted). Our decision in Straach forecloses Fields’s argument that the variation on the Allen charge was unfairly prejudicial and coercive.
In Straach we considered the following charge given to a deadlocked jury: “ ‘Considering the length of the trial and the amount of the evidence to be considered, the Court requests that you continue your deliberations in an effort to reach a verdict on all counts.’ ” 987 F.2d at 243. Finding no abuse of discretion, we stated that
[t]he note did not coerce the minority jury members into agreement with the majority, or set a time limit on deliberations. The note expressed no opinion as to what kind of verdict the court preferred .... Of course, the phrase “considering the length of the trial and the amount of the evidence to be considered” might have been read by a juror to mean that the result should be obvious to all jurors upon due consideration of the evidence. However, it remains difficult to construe the note as coercive or as favoring a particular verdict, insofar as it simply urged that “an effort” be made to reach a unanimous verdict. Thus, even if the note’s language deviated in some respects from that of previously approved Allen charges, it was acceptable.
Id. (emphasis added). The instruction here, similar to the one in Straach, is *340 arguably even less problematic than the one upheld there, because the instant instruction contains no language in any way suggesting that “the result should be obvious.”
Fields’s attempt to distinguish Straach on the ground that the supplemental instruction in this case told jurors to “keep deliberating,” without any language indicating that only “an effort” need be made, is unpersuasive. Without setting any time limit on deliberations or indicating that a verdict must be reached, the idea that only “an effort” is required is implicit in the simple instruction to “continue deliberations,” particularly considering that the jury had been deliberating for only six hours when the instruction was given.
Finally, contrary to Fields’s suggestion, the fact that the jury handed down a unanimous sentence of death approximately one hour after receiving the supplemental instruction does not indicate that the instruction was coercive. In Montoya v. Scott, 65 F.3d 405, 409-10 (5th Cir.1995), we found no coercion even where the jury returned its verdict within forty minutes of receiving the challenged supplemental instruction. On the basis of Straach, the district court did not abuse its discretion in instructing the jury to continue its deliberations.

3. GOVERNMENT’S CLOSING ARGUMENT

In the government’s closing argument at sentencing, the prosecutor employed a televisual “picture in picture” metaphor, telling the jury to imagine that Fields’s activities before, during, and after Coleman’s murder were playing on one screen, while Coleman’s activities before and at the time of her murder were playing on the other. Fields did not object to the manner or content of the prosecutor’s discussion. He assei'ts, for the first time on appeal, that the district court violated his due process and Eighth Amendment rights by allowing the government to use this metaphor. Additionally, he argues that the government’s use of the metaphor resulted in a sentence based in part on “passion, prejudice, or other arbitrary factor,” in violation of 18 U.S.C. § 3595(c)(2)(A).
“As a general rule, constitutional and other legal questions are reviewed de novo.” United States v. Delgado-Nunez, 295 F.3d 494, 496 (5th Cir.2002) (internal citations and quotations omitted). Claims of error not preserved at trial, however, are reviewed for plain error only. Fed.R.CRIm.P. 52(b).
Fields claims that comparative worth arguments that encourage the jury to compare the value of the victim’s life with the defendant’s are impermissible under Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In Payne, however, the Court held only that the Eighth Amendment does not erect a per se bar to victim impact evidence and that such evidence is admissible unless it is “so unduly prejudicial that it renders the trial fundamentally unfair.” Id. at 825, 111 S.Ct. 2597. With regard to comparative worth arguments, the Court stated only that the “concern ... that the admission of victim impact evidence permits a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy” is largely unwarranted, because victim impact evidence is rarely offered for such a purpose. Id. at 823, 111 S.Ct. 2597.
Thus, to the extent that the Court expressed disapproval of comparative worth arguments, it did so only with regard to victim-to-victim comparisons, not victim-to-defendant comparisons. Indeed, in Humphries v. Ozmint, 397 F.3d 206, 224 n. 8 *341 (4th Cir.), cert. denied, — U.S. -, 126 S.Ct. 128, 163 L.Ed.2d 133 (2005), the court noted that Payne does not foreclose victim-defendant comparisons; it suggested that “[a] victim-to-victim comparison is more pernicious than a victim-to-defendant comparison because, not only does it invite a commentary on collateral evidence not properly before the jury (the worthiness of other members (victims) of society), it does not counteract the defendant’s mitigating evidence, which was one of the main goals of Payne.”
Given that victim impact evidence and evidence of a defendant’s character (both positive and negative) are admissible at capital sentencing, it is difficult to discern how the prosecutor’s use of the picture-in-picture metaphor violated Fields’s constitutional and/or statutory rights. The purpose of the metaphor, aside from establishing a chronology of events, was to highlight the nonstatutory aggravating factors the government was trying (and is permitted) to establish: that Coleman was the mother of a newborn who needed her attention and that Fields is a consistently violent man who cruelly took her life away. Accordingly, there is no error, let alone plain error, in allowing the government to present its closing argument as it did.

Í. EXPERT TESTIMONY ON FUTURE DANGEROUSNESS

Fields claims that introducing certain expert psychiatric testimony on the issue of future dangerousness constituted error.

a. Statutory Challenge

Fields contends that the district court committed statutory error in admitting the expert testimony of a forensic psychiatrist, Dr. Coons, during the punishment phase of trial. Our review is for abuse of discretion. See Hall, 152 F.3d at 402.

i. Background

Prior to Dr. Coons testifying, Fields moved to examine him outside the presence of the jury to make a challenge pursuant to Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The court granted Fields’s motion to examine Dr. Coons regarding the reliability of predicting future dangerousness. However, the court ultimately overruled Fields’s objections and allowed the Government to call Dr. Coons to testify.
After Dr. Coons testified regarding his education and experience, the prosecutor posed a hypothetical, which consisted of the facts of the instant capital murder and some of Fields’s background and criminal history. Based upon this hypothetical, the prosecutor asked Dr. Coons whether such an individual would constitute a future danger to others, including persons in a correctional facility. Dr. Coons responded that there was a “probability of future violence.”

ii. Analysis

On appeal, Fields makes clear that he is not arguing that psychiatric predictions of future dangerousness during the punishment phase are inadmissible per se. Instead, he states that the “question is whether the evidence before the trial court on this record reflected a showing of reliability sufficient to support the admission as expert opinion of Dr. Coons’s admittedly subjective and nonscientific prediction about Fields’s future dangerousness.”

(1) Daubert Does Not Apply

We first address the argument that standards governing the admissibility of expert evidence at trial should also govern, either strictly or loosely, at capital sentencing. Federal Rule of Evidence 702 *342 provides that expert evidence is admissible if, inter alia, it “is the product of reliable principles and methods” that are applied “reliably to the facts of the case.” In Daubert, the Supreme Court held that Rule 702 superseded the requirement of general acceptance for admission of scientific expert testimony. See 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. “Under Daubert, the district court conducts a ‘preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.’ ” United States v. Norris, 217 F.3d 262, 269 (5th Cir.2000) (quoting Daubert, 509 U.S. at 592-93, 113 S.Ct. 2786) (also citing Fed.R.Evid. 702). Daubert “provides an illustrative list of factors that may aid a court in evaluating reliability.” Mathis v. Exxon, 302 F.3d 448, 460 (5th Cir.2002).[24]
The amicus curiae in this case, the American Psychological Association, urges that we formally adopt the Daubert reliability factors for determining the admissibility of expert evidence in federal death penalty sentencing hearings. Similarly, Fields argues that a district court must apply Daubert or conduct a quasi -Daubert inquiry when deciding whether to admit proffered expert testimony at the punishment phase of a federal capital murder trial. Fields contends that although the Daubert test “may not apply by its own terms under the FDPA, ... the same principles necessarily inform the inquiry whether proffered evidence meets the applicable statutory requirements, as well as the overarching constitutional command of ‘heightened reliability.’ ” We reject both positions.
No Circuit that we are aware of has applied Daubert to sentencing.[25] Moreover, as Fields acknowledges, the FDPA provides that evidence may be admitted “regardless of its admissibility under the rules governing admission of evidence at criminal trials.” 18 U.S.C. § 3593(c) (emphasis added). The FDPA by its terms does not fully implement the Federal Rules of Evidence at the punishment phase. Since Daubert’s holding was based on the Federal Rules of Evidence, it is not directly applicable.
That does not entirely answer the question as to whether some qnasi-Daubert inquiry is required to satisfy the FDPA. Fields argues that other parts of the FDPA should inform our inquiry, specifically pointing to section 3593(c) that provides that Dr. Coons’s testimony may be excluded if Fields has shown that its “probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.”[26] We are *343 somewhat sympathetic to the argument, but ultimately cannot read a provision into the FDPA that evaluating the probative value of expert testimony for sentencing purposes requires a form of Daubert hearing. Fields cannot point us to where such a requirement appears, even implicitly, in the text, history or logic of the FDPA. His statutory argument is unavailing and is better couched as a constitutional claim based in the Eighth and Fifth Amendments. Unfortunately for Fields, that constitutional argument is foreclosed and it is beyond our power to revisit it. See Part II.A.2.b.

(2) Barefoot v. Estelle’s Logic Undermines Fields’s General Reliability Argument

Fields also argues more generally under section 3593(c) that, if Dr. Coons’s testimony is shown to be unreliable, the “evidence cannot assist the jury as it is plainly not ‘probative’ of anything.” We are not persuaded by this argument.
“The Federal Death Penalty Act ... erects very low barriers to the admission of evidence at capital sentencing hearings. Since the need to regulate the scope of testimony is less at the penalty phase than at the guilt phase of trial, parties may present evidence ‘as to any matter relevant to the sentence.’ ”[27] United States v. Lee, 274 F.3d 485, 494 (8th Cir.2001) (quoting 18 U.S.C. § 3593(c)). As noted above, the sole statutory restriction is that evidence may be excluded if it is more prejudicial than probative.
The seminal case regarding whether expert testimony is reliable and should be allowed with respect to future dangerousness predictions during the punishment phase of a capital murder trial is Barefoot v. Estelle, 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983). Although Barefoot involved a constitutional challenge on collateral review and thus is not technically controlling, the Supreme Court’s reasoning certainly must inform our analysis of this related issue. Ultimately, Barefoot’s sweeping logic requires us to reject Fields’s general reliability argument.
In Barefoot, the petitioner argued that the testimony of two psychiatrists regarding his future dangerousness during the punishment phase of his state capital murder trial was unconstitutional. Barefoot broadly argued that psychiatrists (1) were incompetent to predict future dangerousness to an acceptable degree of reliability and (2) should not be permitted to testify regarding future dangerousness in response to a hypothetical or without examining the defendant. Id. at 896, 103 S.Ct. 3383. He also argued that his death sentence should be set aside because the testimony was unreliable under the particular circumstances of his case. The Supreme Court rejected all his arguments. Id.
With respect to the argument that no psychiatrist should testify as to the future dangerousness of a defendant, the Supreme Court explained that such a rule “is contrary to our cases.” Id. Because predicting future dangerousness “is a constitutionally acceptable criterion for imposing the death penalty,” and it is “not impossible for even a lay person sensibly to arrive at that conclusion, it makes little sense, if any, to submit that psychiatrists, out of the entire universe of persons who *344 might have an opinion on the issue, would know so little about the subject that they should not be permitted to testify.” Id. at 896-97, 103 S.Ct. 3383 (citing Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)); see also Estelle v. Smith, 451 U.S. at 473, 101 S.Ct. 1866 (reiterating the validity of Jurek and in “no sense disapproving the use of psychiatric testimony bearing on the issue of future dangerousness”).
Additionally, the Court reasoned that, to accept Barefoot’s argument that expert testimony predicting future dangerousness “is far too unreliable to be admissible would immediately call into question those other contexts in which predictions of future behavior are constantly made.” Barefoot, 463 U.S. at 898, 103 S.Ct. 3383; see, e.g., O’Connor v. Donaldson, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (explaining that expert psychiatrists and psychologists interpret facts that determine whether an individual is dangerous to himself or others and in need of civil commitment). The Court further explained that expert testimony regarding future dangerousness “may be countered not only as erroneous in a particular case but also as generally so unreliable that it should be ignored.” Barefoot, 463 U.S. at 898, 103 S.Ct. 3383.
Similarly, the Barefoot Court refused to accept the American Psychiatric Association’s position in its amicus brief that such expert testimony should be barred as unreliable because it was in error “most of the time.” Id. at 901, 103 S.Ct. 3383. Noting that it had rejected the same view in Estelle v. Smith, the Court was “not persuaded that such testimony is almost entirely unreliable and that the fact-finder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.” Id. at 899, 103 S.Ct. 3383.
The Supreme Court also rejected Barefoot’s argument that future dangerousness testimony should be based upon personal examination rather than hypothetieals. The Court recognized that expert testimony, including responses to hypothetieals, was routinely admitted if it assisted the factfinder. Id. at 903, 103 S.Ct. 3383. It further observed that neither the extant Federal Rules of Evidence nor state law lent support to the argument that the use of hypothetieals was unconstitutional. Id. at 904-05, 103 S.Ct. 3383.
Finally, Barefoot asserted that the use of hypothetieals in his case violated due process of law. Id. at 904, 103 S.Ct. 3383. The Supreme Court summarily found no constitutional violation. The Supreme Court stated that “to agree with petitioner’s basic position would seriously undermine and in effect overrule Jurek,” and it was not inclined to do so. Id. at 906, 103 S.Ct. 3383 (emphasis added).[28]
As previously set forth, although we recognize that Barefoot involved a constitutional challenge, its reasoning informs us in assessing the instant case. Indeed, Fields’s statutory argument is laced with references to the heightened reliability requirement under the Eighth Amendment. In addition, the Barefoot Court’s pragmatic concerns about rejecting future dangerousness testimony apply equally here. *345 Furthermore, the arguments urged today — though framed formally in statutory terms- — are similar in substance to the ones rejected in Barefoot. For example, the amicus in Barefoot, like the amicus here, argued that the future dangerousness methods in issue could be in error most of the time. Likewise, both Fields and Barefoot challenged the experts’ testimony based upon the failure to personally examine the defendant and the use of hypothetieals. The logic of Barefoot meets these challenges.
In the instant case, Dr. Coons’s testimony was probative because Fields’s jury was required to make an assessment of future dangerousness and because the jury could benefit from the opinion of a psychological expert on that matter. Moreover, as Barefoot noted, the adversarial system reduces any prejudicial unreliability in future dangerousness expert testimony because it can expose the flaws in such testimony. For these reasons, we reject the claim that Dr. Coons’s testimony was so unreliable that the district court abused its discretion[29] by admitting it.[30]

b. Constitutional Challenge

Fields also claims that the admission of Dr. Coons’s testimony regarding future dangerousness during the punishment phase violated his rights under the Eighth and Fifth Amendments. Barefoot forecloses this claim. As to Fields’s argument that Barefoot should be revisited, it is the Supreme Court’s prerogative, not ours, to consider revisiting its precedent. See, e.g., Rodriguez de Quijas v. Shearson/Am. Express, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989).

5. PROOF BEYOND A REASONABLE DOUBT AND THE WEIGHING PROCESS

In Fields’s final claim of sentencing error, he seeks to extend the Supreme Court’s decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Specifically, he argues that the FDPA violates the Sixth Amendment, as construed in Ring, because it does not require the jury to apply the reasonable doubt standard in deciding whether the aggravating factors outweigh the miti-gators.
In Ring, the Supreme Court applied Ap-prendi v. New Jersey to capital cases. It reiterated, “If [Congress] makes an increase in a defendant’s authorized punishment contingent on [a] finding of a fact, that fact — no matter how [Congress] labels it — must be found by a jury beyond a reasonable doubt.” 536 U.S. at 602, 122 S.Ct. 2428 (citing Apprendi v. New Jersey, 530 U.S. 466, 482-83, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)). Contrary to Fields’s contention, this rule does not require the jury to apply the reasonable doubt standard during the weighing process.
*346 The Apprendi/Ring rule does not extend to the ultimate decision whether to impose the death penalty. Capital defendants have no constitutional right to a jury at sentencing. See Proffitt v. Florida, 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion). Indeed, the Supreme Court has explicitly held that judges may do the weighing of aggravating and mitigating circumstances consistent with the Constitution. See Clemons v. Mississippi, 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). The Court’s Apprendi line of cases reveals that the reasonable doubt standard is appurtenant to the right to jury trial.[31] Since the Constitution does not require a jury to do the weighing, we cannot conclude that the showing required must be proof beyond a reasonable doubt.
Moreover, the Apprendi/Ring rule should not apply here because the jury’s decision that the aggravating factors outweigh the mitigating factors is not a finding of fact. Instead, it is a “highly subjective,” “largely moral judgment” “regarding the punishment that a particular person deserves Caldwell v. Mississippi, 472 U.S. 320, 340 n. 7, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In death cases, “the sentence imposed at the penalty stage ... reflects] a reasoned moral response to the defendant’s background, character, and crime.” Penry v. Lynaugh, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (emphasis in original). The Appren-di/Ring rule applies by its terms only to findings of fact, not to moral judgments. See Ring, 536 U.S. at 602, 122 S.Ct. 2428.
The Supreme Court’s reasoning in Kansas v. Marsh, — U.S. -, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), supports our conclusion. In Marsh, the Court construed a previous decision, Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), as holding “that a state death penalty statute may place the burden on the defendant to prove that mitigating circumstances outweigh aggravating circumstances.” Marsh, 126 S.Ct. at 2524. Additionally, in a concurring opinion in Marsh, Justice Scalia recognized that the Constitution does not require a reasonable doubt standard as to the weighing process: “[T]he State could, as Marsh freely admits, [adopt a] scheme requiring the State to prove by a mere preponderance of the evidence that the aggravators outweigh the mitigators.” Id. at 2532 n. 2. No member of the Marsh Court disagreed. Accordingly, we hold that the Sixth Amendment does not require a jury to be instructed that it must find that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt.

B. CLAIMS OF TRIAL ERROR

We first address Fields’s arguments that the district court committed error that requires reversal of his convictions. Ultimately, we affirm each conviction.

*347
1. FAILURE TO CONSULT PUBLIC DEFENDER ON APPOINTED COUNSEL

Fields’s first guilt-phase claim is that the district court erred by failing to secure the advice of the Federal Public Defender (“FPD”) before appointing him capital counsel. The appointment of counsel to represent indigent defendants in capital cases is governed by 18 U.S.C. § 3005. It provides that those charged with federal capital offenses are entitled to two lawyers, one of whom “shall be learned in the law applicable to capital cases.” Section 3005 further requires: “In assigning counsel under this section, the court shall consider the recommendation of the Federal Public Defender organization, or, if no such organization exists in the district, of the Administrative Office of the United States Courts.”

a.Background

After Fields was charged with a capital offense, his attorney, Scott Peterson, filed a motion pursuant to section 3005 asking the court to appoint a second attorney learned in the law of capital cases. Attorney Peterson advised the court that Rob Swanton had agreed to be co-counsel. The court stated that Swanton was “more than acceptable” because he was “an excellent, excellent attorney.” Two days later, the court entered an order formally appointing Swanton as lead counsel. It found, “Mr. Swanton is learned in the law applicable to capital cases and is qualified to appear as counsel because of his distinguished prior experience in the trial of death-penalty cases.” Fields made no objection either to the court’s decision to appoint Swanton or to its failure to consult the FPD before so deciding.
After trial, Fields moved to supplement the appellate record with the affidavit of Lucien Campbell, the Federal Public Defender for the Western District of Texas. In the affidavit, Campbell stated that the district court did not request his recommendation for the appointment of counsel. The court granted the motion to supplement and acknowledged on the record that it did not confer with the FPD. It also stated, “Scott Peterson and Rob Swanton were appointed to represent Mr. Fields because of their years of experience in the criminal defense field, including numerous capital cases. Additionally, Mr. Peterson was the Defendant’s attorney of record on the original federal gun case for which he was in jail at the time of his escape.”

b.Standard of Review

Fields contends that we should review de novo even though he raises the court’s noncompliance with section 3005 for the first time on appeal. However, a contemporaneous objection ordinarily is required to preserve error. See United States v. Olano, 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). None of Fields’s arguments provides justification for us to deviate from that general rule. Section 3005 came into play, at the earliest, only after the Government charged Fields with a capital offense. By that time, Fields already was represented by counsel, Attorney Peterson. Fields had ample opportunity to object below through his attorney on the grounds he now asserts. Since he failed to do so, we review his claim for plain error. Fields can only prevail if he shows “that (1) there is an error, and that the error (2) is plain, (3) affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings.” See United States v. Garza, 429 F.3d 165, 169 (5th Cir.2005), cert. denied, — U.S. -, 126 S.Ct. 1444, 164 L.Ed.2d 143 (2006).

c.Analysis

Assuming arguendo that Fields’s claim would succeed on the first two prongs of plain-error review, it fails on the *348 third prong. Fields cannot show prejudice. He acknowledges that the purpose of securing the FPD’s recommendation is to ensure the high-quality representation necessary in capital eases. See United States v. Shepherd, 576 F.2d 719, 728-29 (7th Cir.1978). He does not argue, however, that the district court erred in determining that Swanton was an “excellent” attorney who was learned in the law of capital defense (indeed “distinguished”) or that the court incorrectly found that both his attorneys, Swanton and Peterson, had each tried numerous capital eases through years of experience in the field of criminal defense. Thus, Fields cannot show that the error affected his substantial rights.[32]
Unable to show actual prejudice, Fields argues that no such showing should be required due to the “fundamentally structural character of the error.” The Supreme Court has indicated that the structural error doctrine applies only in a “very limited class of cases.” Neder v. United States, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). Only errors that “undermin[e] the fairness of a criminal proceeding as a whole ... require[ ] reversal without regard to the mistake’s effect on the proceeding.” See United States v. Dominguez Benitez, 542 U.S. 74, 81, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004). The statutory error asserted here is not so fundamental. Additionally, there is no “strong support” in the operable statute to suggest an “implied repeal” of Federal Rule of Criminal Procedure 52, which requires us to disregard errors that do not affect substantial rights. See Zedner v. United States, — U.S. -, 126 S.Ct. 1976, 1989, 164 L.Ed.2d 749 (2006).
In support of his argument that the error here is structural, Fields cites a line of Fourth Circuit cases. See, e.g., United States v. Williams, 544 F.2d 1215, 1218 (4th Cir.1976) (holding that failure to appoint second counsel under section 3005 “gives rise to an irrebuttable presumption of prejudice”). This line of cases is inap-posite. They all involve district courts’ failures to appoint any second counsel. Such an error is considerably more serious than what occurred here. Moreover, the Third Circuit has explicitly rejected the Fourth Circuit’s presumed-prejudice approach to a court’s failure to appoint second counsel. See United States v. Casseus, 282 F.3d 253, 256 n. 1 (3d Cir.2002). Without taking sides in this Circuit split, we decline to extend the Fourth Circuit’s approach in the way Fields suggests. Accordingly, we reject Fields’s claim that failing to consult the FPD before appointing capital counsel is structural error or that prejudice must be presumed. Since Fields cannot show prejudice, his claim fails.

2. CONFLICT OF INTEREST/WAIVER OF RIGHT TO COUNSEL

Fields makes two related arguments surrounding his trial attorney’s alleged *349 conflict of interest. He argues, first, that the district court’s refusal to appoint un-conflicted substitute counsel rendered his waiver of counsel involuntary.[33] Second, he contends that the district court neglected its “duty to inquire” about an apparent conflict of interest. See Cuyler v. Sullivan, 446 U.S. 335, 347-48, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). The Government acknowledges that our review of these issues is de novo. See United States v. Jones, 421 F.3d 359, 362-63 (5th Cir.2005).

a. Background

As the trial date approached, Fields filed a request asking the trial court to appoint new counsel. He represented that “if the Court d[id] not allow him new trial counsel, that he intended] to represent himself.” Fields had threatened several times to invoke his right to represent himself but ultimately withdrew those motions. The district court held an ex parte hearing on Fields’s latest motion.
At the hearing, Fields’s lawyers informed the court that they had tried in vain to persuade Fields that going pro se would be a grave mistake. Additionally, Fields’s lead attorney, Swanton, advised the court of “one other issue that’s come up” concerning his co-counsel, Peterson:
Back in 1987 ... [,] there is a small entry in [Fields’s] juvenile record that indicates Mr. Peterson[,] when he was working for the McLennan County district attorney’s office[,] either authorized prosecution of Mr. Fields for a — if I remember it correctly, it was a burglary of a habitation case. I’m not sure that Mr. Peterson was actually directly involved in the prosecution. Frankly, Mr. Peterson cannot remember being involved in that, and it simply may be that somebody from the police or probation department called somebody at the D.A.’s office and asked for permission to file a petition. We have talked to Mr. Fields about that and while we don’t really perceive it as a conflict, Mr. Peterson has certainly worked diligently on this case and that has never been an issue through the two years of representation. We talked to Mr. Fields about that and let him know that somebody somewhere down the line may see that as a perceived conflict of interest and that if he had any concerns about that, he should talk with the Court about it.
We’d certainly be happy to offer information or testimony from Mr. Peterson if you thought that was necessary as to what he thinks his involvement was in that prosecution and put something on the record in that regard.
The entry to which Swanton referred states, “On 3-20-87 Scott Peterson, Assistant District Attorney, authorized the filing of a delinquency action against Sherman.” Fields’s juvenile record does not reflect any further involvement in the action by Peterson.
After Swanton’s representation, the court allowed Fields to speak about his request to replace his attorneys. Fields expressed generalized “suspicio[n]s” that his attorneys were in league with the Government. He voiced disagreement with his attorneys’ strategy, indicating that they were pursuing mitigation for the penalty phase “when I repeatedly profess my innocence.” “Their strategy guarantees me the death penalty.”
At a subsequent hearing, Fields expressed generieally, “[M]y attorneys and I have a major conflict of interest ....” Fields never mentioned any specific con *350 cern that Peterson had authorized delinquency proceedings against him as a twelve-year-old. The district court did not seek further information concerning the purported conflict. Ultimately, the court denied Fields’s request for new counsel and permitted him to proceed pro se.

b. Analysis

i. Voluntariness of Waiver

(1) The Waiver Was Voluntary If There Was No Conflict of Interest

A court violates the Sixth Amendment if it allows a defendant to represent himself without first obtaining a valid waiver of counsel. See, e.g., United States v. Medina, 161 F.3d 867, 870 (5th Cir.1998). A defendant cannot be forced to choose between conflicted counsel and no counsel at all, and any waiver of counsel that results from those circumstances is not valid. See Dunn v. Johnson, 162 F.3d 302, 307 (5th Cir.1998).
However, indigent defendants have no right to appointed counsel of their choice. See, e.g., United States v. Breeland, 53 F.3d 100, 106 n. 11 (5th Cir.1995). Rather, “[a] defendant’s refusal without good cause to proceed with able appointed counsel constitutes a voluntary waiver of that right.” Richardson v. Lucas, 741 F.2d 753, 757 (5th Cir.1984). “The question [of voluntariness] therefore boils down to whether [Fields] demonstrated good cause for the substitution of assigned counsel.” McKee v. Harris, 649 F.2d 927, 931 (2d Cir.1981). One form of good cause for new counsel — the only one relevant here— is to show that counsel labored under a conflict of interest. See, e.g., United States v. Young, 482 F.2d 993, 995 (5th Cir.1973).

(2) Insignificant or Insubstantial Conflicts Do Not Warrant Substitute Counsel

A district court need not appoint substitute counsel on conflict-of-interest grounds if it is “satisfied that any conflict does not risk compromising the defendant’s representation.” United States v. Solomon, 42 Fed.Appx. 88, 91 (10th Cir.2002) (unpublished).[34] As the Eighth Circuit has held, a defendant is only entitled to substitute counsel if the court finds significant interference with an existing attorney’s “ability to provide zealous representation.” See United States v. Boone, 437 F.3d 829, 839 (8th Cir.), cert. denied, — U.S. -, 127 S.Ct. 172, 166 L.Ed.2d 123 (2006). This follows logically from the proposition that defendants are not entitled to appointed counsel of their choice. That rule would be rendered a nullity if insubstantial complaints entitled defendants to substitute counsel.
Indeed, the only precedent we have found touching the specific issue sub judi-ce, Dunn v. Johnson, indicates that the conflict asserted must be significant to warrant substitute counsel. See 162 F.3d at 307. Dunn argued that his waiver of counsel was involuntary because his appointed attorneys had a conflict of interest. In support of this claim, Dunn asserted that, prior to his trial, he had filed a malpractice suit against his attorneys. We did not recognize this as a significant enough conflict of interest to render *351 Dunn’s waiver involuntary, pointing out that the “malpractice suit ... had been dismissed as frivolous three years before his second trial.” Id.[35]

(3) The Conflict Alleged Was Not Serious Enough to Entitle Fields to New Counsel

Applying these principles to the case at bar, the supposed conflict of interest was not sufficiently substantial such that Fields was entitled to substitute counsel. Importantly, this is not a case where a defendant’s attorney previously was actively involved in prosecuting the defendant. The record indicates that Attorney Peterson did nothing more than sign off summarily on a request to initiate delinquency proceedings against Fields. Moreover, the juvenile adjudication occurred fifteen years before Fields’s capital trial. Also, it is important that Fields’s counsel did not “perceive it as a conflict.” District courts reasonably may rely on defense counsel’s assessment regarding the potential for conflict. See Holloway v. Arkansas, 435 U.S. 475, 485, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (stating that the appointed attorney “is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial”).
Our conclusion is bolstered by Hernandez v. Johnson, 108 F.3d 554, 558-61 (5th Cir.1997), where we addressed a similar alleged conflict of interest. In Hernandez, the defendant claimed that his lawyer had a conflict of interest because he previously had served “as the elected district attorney” when some of the defendant’s prior convictions were obtained. Id. at 558. During that service, Hernandez’s attorney had “signed a motion requesting psychiatric evaluation of appellant ..., signed a motion to dismiss a related indictment after Hernandez pled guilty, and ... approved Hernandez’s plea bargain.” Id. at 558-59. We held that the attorney’s previous involvement in Hernandez’s prosecution was not “personal or substantial enough to give rise automatically to an actual conflict,” reasoning that he was only “tenuously and nominally connected to the prior cases against Hernandez” and that the attorney’s service for the state “ended nine years before.” Id. at 560. Likewise, Peterson’s involvement was nominal and tenuous, rather than personal or substantial.
Fields speculates, however, that Peterson may have “continued under a duty to the State of Texas not to undermine the finality and integrity of the prosecution he authorized against Fields.” Since Peterson would have a duty in capital sentencing proceedings to attack Fields’s past convictions, Fields reasons, this created a conflict of interest. There are at least three problems with this argument. First, we rejected a similar argument in Hernandez, a death-penalty case. Second, Fields cites no authority for the expansive duty he claims Peterson may have owed to Texas, whose service Peterson left long before Fields’s trial. See Spreitzer v. Peters, 114 F.3d 1435, 1452 (7th Cir.1997) (rejecting a conflict-of-interest claim where the attorney’s “supposedly conflicting loyalty” to the Government was “extremely speculative and remote”). Third, Fields has given no indication that there was any good faith *352 basis for attacking the juvenile adjudication at issue. Under the circumstances, Peterson did not labor under a conflict of interest substantial enough to significantly threaten his ability to provide Fields with effective representation. That being so, Fields’s waiver of counsel was voluntary.[36]

ii. Duty to Inquire

We now turn to Fields’s argument that the district court failed to inquire into the conflict at issue. His argument fails for two reasons.

(1) Under the Circumstances, the Court Adequately Inquired

First, the court adequately investigated the potential conflict. It held an ex parte hearing on Fields’s motion for substitute counsel. At that hearing, the court listened to Fields’s lead attorney speak about the conflict. The attorney described the nature of the prior prosecution, the approximate date on which it took place, and the extent of Peterson’s involvement in it. The court also heard Fields’s counsel’s opinion that the “issue” was not really a conflict and had not affected the quality of Fields’s representation. Afterward, the court gave Fields the opportunity to discuss the alleged conflict, which he declined to do.
Fields complains that the court did not affirmatively question the parties involved. Yet, the purpose of the duty to inquire is to assure that the court is apprised adequately of “the nature of a conflict” and its potential impact on counsel’s capacity to represent the defendant. See United States v. Humphrey, 287 F.3d 422, 437 (6th Cir.), overruled on other grounds by United States v. Leachman, 309 F.3d 377 (6th Cir.2002). Here, that purpose was satisfied because discussions the court heard on the record apprised it sufficiently of the relevant facts. See Holleman v. Cotton, 301 F.3d 737, 744 (7th Cir.2002) (noting, while addressing a duty-to-inquire issue, “the presumption that attorneys make truthful representations to the court”); United States v. Haren, 952 F.2d 190, 195 (8th Cir.1991) (“A district court may give substantial weight to defense counsel’s representations regarding conflicts of interest.”). Those facts showed that the conflict was insubstantial.
Where a conflict appears serious and the existing information available to the court is limited, “probing and specific questions” indeed may be required. See Wayne R. LaFave et al, 3 CRIMINAL PROCEDURE § 11.9(b) (3d ed.2000). But that is not the case here. The duty to inquire is not so formalistic as to require affirmative questioning when such is rendered unnecessary because the parties have volunteered all the relevant information for a court to determine that no substantial conflict exists. “[T]he trial court did not have a duty to inquire any further.” See Dunn, 162 F.3d at 307.

(2) Any Failure to Inquire Further Did Not Affect the Voluntariness of Fields’s Waiver

Second, even if the court should have made a greater inquiry, Fields has made no showing, as distinguished from mere speculation, that the district court would have learned anything material from that inquiry. See United States v. Fish, 34 F.3d 488, 493 (7th Cir.1994) (examining whether “the alleged failure of the court to *353 delve deeper into the alleged conflict resulted in its lacking any material information to make the conflict determination”). A failure to inquire would not, in and of itself, be Sixth Amendment error warranting reversal. See Mickens v. Taylor, 535 U.S. 162, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002). Moreover, without showing that the court failed to elicit information that would have revealed a substantial conflict, Fields cannot show that any failure to inquire affected the voluntariness of his waiver of counsel. Fields’s unsupported hypothesizing that he might not have waived counsel had the court explained to him “the kinds of conflicts tolerated by law” is not sufficient.
Finally, we note that Fields’s (1) suspicions that his attorneys were in cahoots with the Government and (2) generic assertions of a conflict of interest did not impose upon the court a duty to inquire further. The Supreme Court has stated that merely a “vague, unspecified possibility of conflict” does not trigger a duty to inquire. See Mickens, 535 U.S. at 168-69, 122 S.Ct. 1237. Fields’s nebulous statements raised nothing more than a vague, unspecified possibility of conflict.[37]
Indeed, Fields’s previous requests for new counsel reflect that he misunderstood the term “conflict of interest.” He used the term to signify a “conflict” between his own view of appropriate trial strategy and that of his counsel.[38] Mere disagreement about strategic litigation decisions is not a conflict of interest. See, e.g., United States v. Corana-Garcia, 210 F.3d 973, 977 n. 2 (9th Cir.2000). In context, then, Fields’s unspecified assertions of a conflict appear even more benign.
In conclusion, Fields’s claims surrounding Peterson’s alleged conflict of interest fail.

3. JURY INSTRUCTION ON SIGNIFICANCE OF THE INDICTMENT

Fields argues that the district court erred in instructing the jury venire about the significance of the grand jury’s decision to indict him. The court instructed the jury venire that the grand jury’s finding of probable cause meant the grand jury believed “more likely than not” that Fields had committed the offense. Fields points out that the probable cause standard is lower than the preponderance standard. See, e.g., United States v. Watson, 273 F.3d 599, 602 (5th Cir.2001). The Government argues, inter alia, that any error did not prejudice Fields.
Because Fields did not object to the instruction below, his claim is reviewed for plain error. See United States v. Saldana, 427 F.3d 298, 304 (5th Cir.), cert. denied, — U.S. -, 126 S.Ct. 810, 163 L.Ed.2d 637 (2005), and cert. denied, — U.S. -, 126 S.Ct. 1097, 163 L.Ed.2d 911 (2006). He bears the burden of showing that the error affected his substantial rights. See, e.g., Garza, 429 F.3d at 169. Fields cannot carry this burden. The jury venire was repeatedly instructed that the grand jury’s indictment could not be considered as evidence. Additionally, *354 the court instructed that Fields maintained the presumption of innocence. It advised that the Government bore the burden of proving guilt beyond a reasonable doubt and gave a correct definition of that standard of proof. The petit jury never was instructed to apply the preponderance standard.
In sum, although the court incorrectly advised the jury venire about the grand jury’s finding, it correctly instructed the petit jury about its own task and correctly required that it perform that task independently from the indictment. “Jurors are presumed to follow their instructions, and there is no reason to assume that they did not do so in this instance.” Woods v. Johnson, 75 F.3d 1017, 1036 n. 29 (5th Cir.1996) (internal citation omitted). Thus, Fields cannot show that the error affected his substantial rights.

k. PHOTOGRAPHS OF MURDER VICTIM

Fields’s fourth claim of trial error is that the district court erroneously admitted into evidence thirty-two photographs of the victim’s body. Fields contends that the photos were extraordinarily prejudicial and had minimal, if any, probative value.

a. Rule IOS and Standard of Review

The governing law and our limited standard of review bear emphasis. Federal Rule of Evidence 403 provides that “evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.” One purpose of Rule 403 is to prevent evidence from “inducing decision on a purely emotional basis.” Fed.R.Evid. 403 (Advisory Committee Notes). However, to warrant exclusion, the danger of unfair prejudice— on this ground or any other — must substantially outweigh the probative value of the evidence. Accordingly, we have recognized that Rule 403’s scope is narrow. “[T]he application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect.” United States v. Pace, 10 F.3d 1106, 1116 (5th Cir.1993).
In light of these principles, we will not lightly second-guess a district court’s decision to admit relevant evidence over a Rule 403 objection. Although reviewing courts use a great variety of verbal formulae to express this fact, all agree that we must afford an especially high level of deference to district courts in such circumstances. Thus, a district court’s decision on Rule 403 grounds is disturbed “rarely” and only when there has been “a clear abuse of discretion.” United States v. Maggitt, 784 F.2d 590, 597 (5th Cir.1986); see United States v. Caldwell, 820 F.2d 1395, 1404 (5th Cir.1987).

b. The Photographs

We have independently examined the photos at issue. They fall into two broad categories: nineteen photos taken at the crime scene and thirteen taken in connection with the autopsy.
Many of the crime scene photos show the victim’s body from various angles and from various degrees of proximity. In the photos, the body is in an advanced state of decomposition and has been subject to animal predation. The' skin is discolored and has sloughed off the bones. The body is surrounded by thick brush and garbage. Other crime scene photos illustrate how the responding officers processed the body. Exhibit 34P, for example, shows that the hands were covered by paper bags. Several others show that the corpse was placed in a body bag.
*355 Of the thirteen autopsy photos, nine show the victim’s skull. Some of these photos show the gunshot wounds; others show the incision the medical examiner made to retrieve the bullets. The four remaining photos show the body, removed from the crime scene, before the autopsy. The most disturbing of these present the victim’s decayed and misshapen corpse completely nude, the clothes apparently having been removed to facilitate the autopsy.
The crime scene and autopsy photos were presented through two witnesses, an officer who helped process the crime scene and the medical examiner who performed the autopsy.
c. Analysis
Many of the photos are, as the defendant posits, shocking. However, our caselaw indicates that admitting gruesome photographs of the victim’s body in a murder case ordinarily does not rise to an abuse of discretion where those photos have nontrivial probative value. See, e.g., United States v. Hall, 152 F.3d 381, 401 (5th Cir.1998), abrogated on other grounds by United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000). As explained below, the photos here did have real probative value. This fact gave the court a reasonable basis for admitting them.
The photos showing the victim’s body decomposing were highly probative. One of Fields’s key themes at trial was that the Government had little physical evidence linking him to the crime. In his opening statement, for example, Fields argued that it was “not possible” to “commit a murder in the time and manner in which the government witnesses allege and not leave any physical evidence.” Similarly, at closing, Fields argued, “I asked you all to pay attention to the physical evidence .... Whatever evidence that they retrieved from the body or the crime scene doesn’t match me.” Fields also highlighted the lack of DNA evidence: “Is there any positive DNA testing ...? No. There isn’t.”
The crime scene photos were necessary to rebut Fields’s arguments. They helped explain why little physical evidence was found: because it had been carried away by animals or worn away by the elements. In this age of the supposed “CSI effect,”[39] explaining to the jury why the Government had little in the way of physical or scientific evidence was arguably critical to the Government’s case.
The photos had additional relevance. The crime scene photos indicated that the body had been dragged to where it was found, thereby corroborating witnesses who testified that Fields told them he had dragged the body. In addition, the wide shots, showing brush and trash surrounding the body, helped explain to the jury why the body was not found until weeks after the murder. Finally, the autopsy photos helped the jury understand the medical examiner’s testimony. Since some photos showed two gunshot wounds, they supported the Government’s (and medical examiner’s) theory about cause of death. This was necessary to corroborate the *356 Government’s confession evidence: Government witnesses testified that Fields told them he shot the victim.
Fields argues, however, that some of the points made by the photos were not in dispute. In Hall, another case involving photographs of a victim’s corpse, we noted: “The fact to which the evidence is directed need not be in dispute.” 152 F.3d at 401.
The reason that a criminal defendant cannot typically avoid the introduction of other evidence of a particular element of the offense by stipulation is that the government must be given the opportunity “to present to the jury a picture of the events relied upon. To substitute for such a picture a naked admission might have the effect to rob the evidence of much of its fair and legitimate weight.”
Id. (quoting Old Chief v. United States, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997)). Here, the Government’s point that the body had decomposed too much for any physical evidence to be found was made more effectively with images than it would have been with vague generalizations about the difficulty in processing weeks-old crime scenes.
Fields also contends that admitting thirty-two photos was unduly cumulative. This argument has four flaws that, taken together, show that it must fail. First, many of the photos had different relevance from other photos. Only a few of the photos, for example, showed with clarity that the victim’s fingers had been eaten away such that recovering trace evidence from under the fingernails would be impossible. Additionally, only a few showed clearly the gunshot wounds in the victim’s skull. While not every photo had probative value strictly independent from any other evidence presented, some of the photos clearly supported points distinct from points made by others.
Second, Rule 403 does not ban per se all duplicative evidence. It is not required that each piece of evidence admitted have an entirely unique theory of relevancy. Indeed, Rule 403 provides that courts should only exclude relevant evidence if the need to avoid cumulative presentation “substantially” outweighs the probative value of the evidence.
Third, Fields’s arguments run up against our deferential standard of review. His brief points out at length that this specific photo or that specific photo was used to make points that might also have been made with other evidence or with another specific photo. This is precisely the sort of strict scrutinizing that we cannot do when reviewing a trial court’s Rule 403 balancing decision.
Lastly, the marginal prejudice that any duplicative photo may have added in this case is minimal. The greatest risk of unfair prejudice resulted from the gruesome scenes depicted in the photos. As we determined above, those scenes were fairly in evidence. It is difficult to see how additional photos showing the same thing significantly harmed Fields. Indeed, Fields himself speculates that showing an inflammatory scene repeatedly may actually diminish its emotional impact. Accordingly, the district court did not clearly abuse its discretion in admitting the thirty-two photos of the victim’s body.

5. USE OF THE STUN BELT

Fields’s next claim is that the district court abused its discretion by requiring him to wear a stun belt at trial. Since Fields failed to object to the stun belt below, our review is only for plain error. Fields contends (1) that the trial court failed to find explicitly that the stun belt was necessary or to exercise its discretion independently from the recommendation of *357 the Marshals Service and (2) that the decision to use a stun belt was substantively unjustified in light of his good behavior during previous court appearances and due to the heightened prejudice restraints may cause a pro se litigant. We hold that the district court committed no reversible error.
As to Fields’s first argument, we have held that a court “may rely heavily on the U.S. Marshal’s advice when deciding whether defendants should be shackled during trial.” United States v. Ellender, 947 F.2d 748, 760 (5th Cir.1991). Moreover, a district court’s failure to assign reasons for physically restraining a defendant — though erroneous — is not “reversible error” where those reasons “are readily apparent to us from the record.” United States v. Hope, 102 F.3d 114, 118 (5th Cir.1996). Here, the Marshals Service testified that Fields (1) had a violent criminal history, (2) had been “aggressive, volatile, and lewd” while in custody, and (3) had a “history of escape and escape attempts.” The district court’s reasons for restraining Fields are readily apparent.
Turning to Fields’s second argument, the district court did not abuse its discretion in deciding to restrain Fields with a stun belt. Physical restraint may be justified where there is “a danger of escape or injury to the jury, counsel, or other trial participants.” See, e.g., United States v. Joseph, 333 F.3d 587, 591 (5th Cir.2003). Fields posed just such dangers. That Fields had not previously misbehaved in court does not eliminate the import of Fields’s previous prison escape attempts and history of violence. A trial court need not wait until an obviously dangerous defendant actually injures trial participants or tries to escape from the courtroom before restraining him. In addition, the district court appropriately took steps to minimize any risk of prejudice. Fields was allowed to conceal the stun belt under street clothes. Moreover, the court took into account the special problems that physical restraints might pose under Fields’s decision to proceed pro se. It provided that both sides would remain seated before the jury. These steps ensured that the jury would neither see the stun belt nor surmise that Fields was being treated differently from the prosecutors. For these reasons, the court did not abuse its discretion.

6. JUROR EXCLUSION

Fields claims that the district court erred by excluding Juror Barnett due to his opposition to the death penalty. We review such claims for abuse of discretion, affording “considerable deference” to the trial court. See United States v. Bernard, 299 F.3d 467, 474 (5th Cir.2002).
The court did not abuse its discretion in striking Barnett. A court may strike jurors for cause if their views on capital punishment would “prevent or substantially impair” the performance of their duties “in accordance with the instruction and oath.” United States v. Webster, 162 F.3d 308, 340 (5th Cir.1998). Barnett stated that he “could never, regardless of the facts and circumstances, return a verdict which resulted in the death penalty.” Similarly he stated at voir dire, “I don’t believe that I would return a verdict of the death sentence in any case” (emphasis added). Statements like those made by Barnett provide a more than adequate basis for exclusion. See, e.g., Bernard, 299 F.3d at 474. Contrary to Fields’s arguments, the court need not have explored Barnett’s positions any further given that Barnett “resoundingly” indicated his refusal to ever apply the death penalty. See United States v. Flores, 63 F.3d 1342, 1354 (5th Cir.1996).

*358
7. PROSECUTORIAL MISCONDUCT

Fields’s next claim of trial error is that the Government committed numerous acts of prosecutorial misconduct that, individually and collectively, denied Fields due process.

a. Standard of Review

We apply a “two-step analysis” to claims of prosecutorial misconduct. United States v. Insaulgarat, 378 F.3d 456, 461 (5th Cir.2004). First, we assess whether “the prosecutor made an improper remark.” Id. If so, then we ask whether the defendant was prejudiced. We have made clear that the prejudice step of the inquiry sets a high bar:
Improper prosecutorial comments constitute reversible error only where the defendant’s right to a fair trial is substantially affected. A criminal conviction is not to be lightly overturned on the basis of a prosecutor’s comments standing alone. The determinative question is whether the prosecutor’s remarks cast serious doubt on the correctness of the jury’s verdict.
United States v. Holmes, 406 F.3d 337, 356 (5th Cir.) (internal citations omitted), cert. denied, — U.S. -, 126 S.Ct. 375, 163 L.Ed.2d 163 (2005).
We generally look to three factors in deciding whether any misconduct casts serious doubt on the verdict: “(1) the magnitude of the prejudicial effect of the prosecutor’s remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction.” United States v. Mares, 402 F.3d 511, 515 (5th Cir.), cert. denied, — U.S. -, 126 S.Ct. 43, 163 L.Ed.2d 76 (2005).
Furthermore, in assessing prejudice, occurrences of prosecutorial misconduct ordinarily must be viewed individually. See United States v. Wicker, 933 F.2d 284, 292 (5th Cir.1991); United States v. Iredia, 866 F.2d 114, 118 (5th Cir.1989). “There may be instances where improper statements, which are not individually prejudicial enough to require reversal, could cumulate to affect the defendant’s substantial rights. However, such instances are rare in this circuit.” Wicker, 933 F.2d at 292. We examine the cumulative error doctrine in Section 9 infra.

b. Analysis

i. Eliciting Inadmissible Evidence

Fields argues, first, that the prosecutors committed misconduct by taking advantage of Fields’s pro se status and repeatedly soliciting evidence of prior bad acts. See Fed.R.Evid. 404(b) (“Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.”).
As an initial matter, we have some difficulty with the allegation that the Government took advantage of Fields. While it is true that the prosecutor is an officer of the court, ours ultimately is an adversarial system. As such, it is the defendant’s attorney, not the prosecutor, who primarily is charged with protecting the defendant’s rights. That is why courts universally recognize that representing oneself in criminal proceedings is “foolish[ ],” Mayberry v. Pennsylvania, 400 U.S. 455, 463, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), which in turn is why defendants must be advised of the dangers of self-representation before they can validly waive counsel, see Faretta v. California, 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
Where those dangers have been hazarded voluntarily, “[w]e reject the notion that *359 the prosecutor ... must abide by some special rules .... ” See State v. Hoff, 31 Wash.App. 809, 812, 644 P.2d 763 (1982). Having waived his right to counsel, Fields cannot now demand that the prosecutors should have effectively served as his lawyers by ensuring that there was no valid objection to their own evidence. See id. Thus, without affording Fields’s misconduct claim any special treatment because he represented himself, we turn to its merits.
The incident highlighted by Fields is the Government’s redirect examination of Kevin Burton, who testified that Fields had bragged to him about killing the victim. The Government elicited that Fields was “known to shoot people” and had tried to rob Burton. On re-redirect, the Government continued with the theme — eliciting that Fields was a “dangerous person” known for “shooting and robbing” crack dealers. Ultimately, the Government drew an objection from Fields, which was sustained. The court subsequently gave a curative instruction.
Fields argues that the Government’s actions in examining Burton amount not only to an evidentiary violation but to prosecutorial misconduct. Viewing the Government’s redirect examinations in context, we disagree. On cross-examination of Burton, Fields appeared to suggest that Burton had recently fabricated Fields’s supposed confession. He asked Burton why he failed to report Fields’s admission until well after it occurred. The Government’s proffer of Fields’s attempted robbery of Burton was used to support Burton’s response; according to Burton, he did not come forward earlier because he was afraid of Fields. Fields’s prior violent conduct toward Burton established that this was a plausible explanation. Prior misconduct is only inadmissible under Rule 404(b) if used for character propensity purposes. Thus, the Government’s initial redirect was proper.
The court did sustain an evidentiary objection on re-redirect as the Government continued to elicit more misconduct evidence. However, the foregoing establishes that the Government had a reasonable basis for pursuing evidence that Fields had committed violent acts, and the court gave curative instructions after sustaining the objection. Under the circumstances, any marginal improper questioning of Burton falls woefully below the severity of what would be required to reverse Fields’s conviction.[40]

ii. Goading Fields with Objections

Fields also complains that the prosecutors schemed to provoke and upset him with frequent objections. A defendant proceeding pro se is expected to follow ordinary procedural rules. See Faretta, 422 U.S. at 834 n. 46, 95 S.Ct. 2525. Here, the prosecutors’ objections to Fields’s failure to do so were proper and, in fact, usually were sustained. Since the Government’s objections were clearly valid, we see no need to complicate matters with inquiry into the prosecutors’ motives for objecting. In short, there was no improper conduct.

Hi. Improper Sidebar Remark

Next, Fields argues that the prosecutors made an improper sidebar remark *360 in their redirect examination of Edward Outley, the man who provided Fields with a gun on the night of his escape. In cross-examining Outley, Fields attempted to show that Outley had recently fabricated his testimony. Among other things, Fields asked Outley whether he told the grand jury about the gun. When Outley said yes, Fields showed him a single page of his grand jury testimony. At prompting from Fields, Outley stated that the document contained no testimony about a gun. The jury was thereby left with the misimpression that Outley, in fact, had omitted any mention of the gun before the grand jury. However, Outley had told the grand jury about the gun—just not on the single page of testimony highlighted by Fields. After the Government confirmed this, the prosecutors asked Outley whether he “just fell for [Fields’s] con [and] forgot that [he] had told [the Grand Jury] all about it .... ” When Outley answered in the affirmative, the prosecutors remarked that “[a] lot of people have fallen for that con.”
Fields argues that prosecutors may not engage in name-calling. However, “[t]he use of colorful pejoratives is not improper.” United States v. Shoff, 151 F.3d 889, 893 (8th Cir.1998); see United States v. Malatesta, 583 F.2d 748, 759 (5th Cir.1978) (“Unflattering characterizations of a defendant do not require a new trial when such descriptions are supported by the evidence.”). In this case, it appears that Fields deliberately tried to mislead the jury. In context, referring to Fields’s actions as a “con” was not out-of-bounds. See United States v. Windom, 510 F.2d 989, 994 (5th Cir.1975) (no mistrial was warranted where prosecutor called the defendant a “con artist”); United States v. Caballero, 277 F.3d 1235, 1249-50 (10th Cir.2002) (no prosecutorial misconduct where defense questioning invited prosecutors to elicit testimony characterizing him as a “con man”); Shoff 151 F.3d at 893 (no prosecutorial misconduct where prosecutor labeled the defendant a “con man” in opening statements). Thus, the prosecutor did not make an improper remark.

iv. Improper Closing Argument

Finally, Fields complains that the prosecutors made several improper remarks at closing argument. Since Fields did not object below to the remarks, we review for plain error. See United States v. Gallardo-Trapero, 185 F.3d 307, 321 (5th Cir.1999).
Most significantly, the prosecutors called Fields a “psychopath.” Assuming arguendo that this remark was clearly or obviously improper, it did not affect Fields’s substantial rights. Undoubtedly, the “psychopath” remark had some risk of inflaming the jury. However, the district court instructed the jury that it must decide the case based on the evidence and that “statements ... or arguments made by the lawyers are not evidence” and are “not binding upon you.” Additionally, though Fields argues the murder case against him was not airtight,[41] the Government produced strong evidence of Fields’s guilt. For example, four witnesses testified that Fields admitted murdering the victim. Those confessions were corroborated by physical evidence showing cause of death and the killer’s attempt to hide the body. In light of this evidence, Fields has not shown that the prosecutors’ remark casts serious doubt on the verdict.
Fields’s remaining claims of improper closing argument also fail because he cannot show prejudice. Fields complains that the prosecutors offered then- *361 personal opinion on the case when they stated they were “sure” Fields planned on having sex with the victim with or without her consent. Fields also contends that the prosecutors injected impermissible character evidence into the jury’s deliberations when they argued that Fields’s courtroom manner showed that Fields “can’t stand to not be in control.” Fields failed to object to these comments below.
We again assume for the sake of argument that these two remarks were improper. Neither statement is so grave, however, that it risked prejudicing substantially the jury’s deliberations. In light of the court’s instructions and the strength of the evidence against Fields, Fields has not shown that either remark casts doubt on the correctness of the jury’s verdict.
5. MANAGEMENT OF STANDBY COUNSEL
Fields complains that the district court’s management of his standby counsel violated his due process rights. He argues that the court failed to “safeguard the orderly process of trial.” See United States v. Nivica, 887 F.2d 1110, 1122 (1st Cir.1989). According to Fields, the court’s inconsistent directions about the role of standby counsel were fundamentally unfair and compromised the integrity of the verdict. Significantly, Fields does not claim that standby counsel’s participation at trial intruded upon his Sixth Amendment right to self-representation.

a. Standard of Review

In the circumstances of this case, our review of this claim is limited. Trial courts must make difficult “judgment calls” when trying to reconcile the role of standby counsel with a defendant’s desire to represent himself. See McKaskle v. Wiggins, 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). Since trial courts clearly are in the best position to make those calls, the Supreme Court has instructed us to accord “deference” to their decisions. Id. We will review for abuse of discretion. See United States v. Lawrence, 161 F.3d 250, 253 (4th Cir.1998). Here, Fields failed to object below to the court’s standby-counsel orders. Thus, our deferential review is restricted even further by the plain-error doctrine. See United States v. Thompson, 130 F.3d 676, 685 n. 14 (5th Cir.1997).

b. Analysis

Fields’s claim fails the first prong of plain error review: the district court did not abuse its discretion. The court’s actions appear to us as nothing more than a reasonable attempt to deal with a trial that turned chaotic due to Fields’s insistence on self-representation. See United States v. Einfeldt, 138 F.3d 373, 378 (8th Cir.1998).
After Fields decided to represent him-, self, the court explained the role of standby counsel. They would serve as Fields’s “legal reference material.” However, Fields was responsible for making statements to the Court and framing questions to witnesses. Accordingly, Fields’s standby counsel were instructed that they could not “represent him through him.” The crux of Fields’s complaint now appears to be that the court, while initially requiring that standby counsel play this very limited role, thereafter allowed them to participate more and more, rendering the rules for standby counsel incomprehensible and compromising the orderly process of trial.
It is necessary to put this complaint in perspective. Fields’s attempt at self-representation was, as he acknowledges, “predictably catastrophic.” Not surprisingly, Fields lacked the legal ability to abide by the elementary rules of courtroom procedure. Fields’s questions frequently were argumentative, e.g.: “Mr. Davis, being a *362 government witness, it’s your job to make excuses for the lack of evidence; am I correct?” Often they were improper, e.g.: “Ms. Hilliard, do you know why [the victim’s] baby was born premature? Isn’t it true that [she] drunk liquor and vinegar in an attempt to abort — ” and “Are you aware that the witness that was just up here said — Many times Fields’s questions were not questions at all. While cross-examining a fellow inmate who testified that Fields confessed to him, Fields said, “Man, I don’t know you from the man in the moon.” He told another witness, “You been watching too many Westerns.”
The court sustained Government objection after Government objection. For example, during Fields’s cross-examination of a witness named Shaylakea Scroggins, the court sustained hearsay objections to four consecutive questions, along with many others. Eventually, the progress of trial became so frustrated by improper questioning that the court dismissed the jurors to determine which of Fields’s questions would be acceptable.
This context shows that Fields’s complaint about the court’s allegedly inconsistent management of standby counsel has no merit. The record indicates that the court had to permit an expanded role for standby counsel later in the trial precisely to ensure that the trial continued in an orderly fashion. Cf. Dunn, 162 F.3d at 307 (stating that an accused has a right to appear pro se only if “he is able and willing to abide by rules of procedure and courtroom protocol”). Fields was allowed to confer frequently with standby counsel to develop his questions because he proved unable to formulate appropriate questions on his own. Standby counsel was allowed to make arguments for Fields outside the jury’s hearing because Fields demonstrated that he could not protect his own interests. The disorderly situation caused by Fields’s self-representation provided the court adequate justification for any inconsistency (if there was inconsistency) in its directives concerning standby counsel. There was no abuse of discretion and no violation of due process.

9. CUMULATIVE ERROR

Fields’s final guilt-phase claim is that his convictions must be set aside for cumulative error. Having determined above that none of his claims warrant reversal individually, we decline to employ the unusual remedy of reversing for cumulative error.[42] Many of Fields’s claims do not amount to error at all. See Section H.B.2., 4., 5., 6., 7., & 8. supra. The remainder do not justify reversal under the cumulative error doctrine because they did not “so fatally infect the trial that they violated the trial’s fundamental fairness.” United States v. Bell, 367 F.3d 452, 471 (5th Cir.2004). Accordingly, Fields’s convictions are affirmed.

III. CONCLUSION

For the reasons above, we AFFIRM Fields’s convictions and sentence.

. The writings for the Court are unanimous, except as to Part II.A.l, authored by Judge Smith and joined only by Judge King.

. It is unclear whether the sex was consensual.

. As to the noncapital counts, the district court sentenced Fields to 715 months of imprisonment.

. This was a typical one-part sentencing proceeding. The court did not hold separate hearings on death eligibility and selection, as some courts have recently done in "trifurcat-ed” capital trials. See, e.g., United States v. Johnson, 378 F.Supp.2d 1051 (N.D.Iowa 2005).

. The jury found two of the three aggravating factors beyond a reasonable doubt (all but "substantial planning and preparation”). Indeed, Fields stipulated to the prior felony conviction involving the use of a firearm.

. See 18 U.S.C. § 3593(d); see also United States v. Jones, 132 F.3d 232, 240 (5th Cir.1998) (stating that "[a]fter finding the existence of at least one statutory aggravating factor [under the FDPA], the jury may consider the existence of nonstatutory aggravating factors for which notice has been given by the government”), aff'd, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999).

. Because the Confrontation Clause does not apply to the testimony challenged in this case, it is unnecessary to determine whether the relevant statements are testimonial under Crawford and Davis v. Washington, - U.S. -, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). Furthermore, as discussed in more detail infra, we decline to decide the applicability of the Confrontation Clause to the presentation of evidence at sentencing that is relevant only to death eligibility or to both eligibility and selection.

. The Court analyzed the relevant issues in Williams under the rubric of due process because the case involved a challenge to a capital sentence imposed by a state court. The Sixth Amendment was not incorporated against the states until Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

. Even the post-incorporation case Specht v. Patterson, 386 U.S. 605, 610, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), which held that due process requires that a defendant "be present with counsel, have an opportunity to be heard, to be confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own” where the sentencing proceeding effectively adds a new charge requiring additional fact-finding and leading to additional punishment, explicitly declined to overrule Williams. See Specht, 386 U.S. at 608, 87 S.Ct. 1209. Although a stronger argument can be made that the death-eligibility phase of a capital sentencing proceeding is similar to a proceeding qualifying for enhanced due process protections under Specht, there is a constitutionally significant distinction between statutory aggravating factors necessary to establish death-eligibility and nonstatutory aggravating factors that may be considered only after a defendant has been determined to be death eligible. See United States v. Bourgeois, 423 F.3d 501, 507 (5th Cir.2005) (holding that failure to charge nonstatutory aggravating factors in indictment is not constitutional error because under the FDPA "only statutory factors expose a criminal defendant to the death penalty”) (relying on Jones v. United States, 527 U.S. 373, 377, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999)). Accordingly, Specht is not applicable to this case because the evidence Fields challenges relates only to nonstatutory aggravating factors.

. See, e.g., United States v. Tucker, 404 U.S. 443, 446-47, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972) (citing, inter alia, Williams for the proposition that in selecting a sentence, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come") (emphasis added); see also Witte v. United States, 515 U.S. 389, 397-98, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995); Wisconsin v. Mitchell, 508 U.S. 476, 485, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993).

. Roche is a noncapital case. The Seventh Circuit, however, had ruled, on the basis of Williams, that "the Supreme Court has held that the Confrontation Clause does not apply to capital sentencing. It applies through the finding of guilt, but not to sentencing, even when that sentence is death.” Szabo v. Walls, 313 F.3d 392, 398 (7th Cir.2002).

. John G. Douglass, Confronting Death: Sixth Amendment Rights at Capital Sentencing, 105 Colum. L.Rev. 1967, 1980 (2005). Indeed, the WilliamsCourt’s reference, picked up by the Gardner Court, to the defendant’s failure to challenge the relevant information "by cross-examination or otherwise" arguably suggests that cross-examination in general, and thus cross-examination of a hearsay de-clarant in particular, should not be deemed the only effective means of denying or explaining adverse information at sentencing.

. This logic applies equally to the generic reference to "the benefit of cross examination” in Barefoot v. Estelle, 463 U.S. 880, 898-99, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983).

. See Proffitt v. Wainwright, 685 F.2d 1227, 1252-55 (11th Cir.1982); United States v. Brown, 441 F.3d 1330, 1361 n. 12 (11th Cir.2006), cert. denied, - U.S. -, 127 S.Ct. 1149, - L.Ed.2d -(2007).

. See Szabo, 313 F.3d at 398 (stating additionally that on collateral review it was "not entitled” to question the holding of Williams in light of more recent developments in capital sentencing).

. See United States v. Higgs, 353 F.3d 281, 324 (4th Cir.2003) (stating that under plain error standard of review "[i]t is far from clear that the Confrontation Clause applies to a capital sentencing proceeding”) (citing United States v. Terry, 916 F.2d 157, 160-61 (4th *331 Cir.1990), for the proposition that "United States courts have a long history of using reliable hearsay for sentencing” and a "trial court may properly consider uncorroborated hearsay evidence that the defendant has had an opportunity to rebut or explain”).

. See Mempa v. Rhay, 389 U.S. 128, 134, 137, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967) (stating that the right is applicable at sentencing in general); Strickland v. Washington, 466 U.S. 668, 686-87, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (holding that the right applies at capital sentencing in particular).

. See Apprendi v. New Jersey, 530 U.S. 466, 482-83, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); Ring v. Arizona, 536 U.S. 584, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In Schriro v. Summerlin, 542 U.S. 348, 354, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004), the Court explained that Ring stands for the proposition that "because Arizona’s statutory aggravators restricted (as a matter of state law) the class of death-eligible defendants, those aggrava-tors effectively were elements for federal constitutional purposes, and so were subject to the procedural requirements the Constitution attaches to trial of elements.” Accordingly, there is a stronger argument to be made for the attachment of the confrontation right where the government is attempting to establish eligibility-triggering factors: Though Ia-beled as "sentencing factors,” those factors are more appropriately considered as elements of a capital offense. This logic applies equally to the establishment of any sentencing factors necessary to expose a defendant to a higher maximum penalty in the noncapital context.
As discussed supra, Fields’s Confrontation Clause challenge relates only to evidence that the government introduced relevant to the jury's ultimate selection decision. The applicability of the Confrontation Clause to the establishment of eligibility-triggering factors is therefore not a question squarely presented by this case, and we decline to resolve it definitively.

.See McMillan v. Pennsylvania, 477 U.S. 79, 93, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986) (holding that "there is no Sixth Amendment right to jury sentencing”); Cabana v. Bullock, 474 U.S. 376, 385, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986) (observing that "[t]he decision whether a particular punishment ... is appropriate in any given case is not one that we have ever required to be made by a jury”); Spaziano v. Florida, 468 U.S. 447, 460, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) (reasoning that "there certainly is nothing in the safeguards necessitated by the Court’s recognition of the qualitative difference of the death pen *332 alty that requires that the sentence be imposed by a jury”).

. See Tucker, 404 U.S. at 446-47, 92 S.Ct. 589; Witte, 515 U.S. at 397-98, 115 S.Ct. 2199; Mitchell, 508 U.S. at 485, 113 S.Ct. 2194; see also, e.g., Hall, 152 F.3d at 405; United States v. Beydoun, 469 F.3d 102, 108 (5th Cir.2006); United States v. Rodriguez, 897 F.2d 1324, 1328 (5th Cir.1990) (reasoning that "[a] court may rely on uncorroborated hearsay testimony” at noncapital sentencing); Roche, 415 F.3d at 618 (observing that the Confrontation Clause, and therefore Crawford, do not apply at sentencing); United States v. Luciano, 414 F.3d 174, 179 (1st Cir.2005) (explaining that "[n]othing in Crawford requires us to alter our previous conclusion that there is no Sixth Amendment Confrontation Clause right at sentencing”); United States v. Martinez, 413 F.3d 239, 243 (2d Cir.2005) (noting that "[njeither Crawford nor Booker ... addressed the applicability of the right of confrontation to the sentencing context or the admissibility of hearsay testimony at sentencing proceedings,” and therefore "[tjhese cases ... provide no basis to question prior Supreme Court decisions that expressly approved the consideration of out-of-court statements at sentencing”); United States v. Chau, 426 F.3d 1318 (11th Cir.2005) (confirming that “there is no precedent from this Court or from the Supreme Court establishing that the Confrontation Clause prohibits the admission of hearsay evidence at sentencing proceedings”).

. Furthermore, caselaw from other circuits calls into question the dissent's textual interpretation of the Sixth Amendment. "As a textual matter, the sixth amendment, which refers to 'criminal prosecutions,’ arguably applies only at trial,” thus suggesting that the words “prosecution” and "trial” are in fact interchangeable. United States v. Kikumura, 918 F.2d 1084, 1102 (3d Cir.1990). "A sentencing hearing ... is not a 'criminal prosecution’ within the meaning of the Sixth Amendment because its sole purpose is to determine only the appropriate punishment for the offense, not the accused’s guilt.” United States v. Francis, 39 F.3d 803, 810 (7th Cir.1994).

. In support of its argument regarding the adversarial nature of capital sentencing proceedings, the dissent makes note of the heightened procedural requirements applied, as a matter of statutory rather than constitutional imperative, in sentencing hearings under the FDPA. In particular, the dissent emphasizes that the Act requires jury sentencing, even though the Sixth Amendment does not. The dissent then cites Robinson v. Polk, 438 F.3d 350, 359 (4th Cir.), cert. denied, - U.S. -, 127 S.Ct. 514, 166 L.Ed.2d 383 (2006), for the proposition that the Confrontation Clause "applies equally to sentencing proceedings tried to a jury." Robinson reaches that conclusion based on Morgan v. Illinois, *334 504 U.S. 719, 727-28, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).
Morgan, however, holds only that due process mandates that in trials in which a jury is not constitutionally required, if one is provided, it “must stand impartial and indifferent to the extent commanded by the Sixth Amendment.” Id. at 727, 112 S.Ct. 2222. Thus, a jury demanded by statute rather than the Constitution must still, for example, be free from racial bias. Morgan says nothing, though, about the manner in which evidence must be presented at sentencing in general, or in front of a sentencing judge or jury in particular. Accordingly, Robinson is unpersuasive.
The dissent's citation of United States v. Cardenas, 9 F.3d 1139, 1154-56 (5th Cir.1993) (en banc), does not boost its argument on this score. The dissent states that Cardenas recognizes "that the Confrontation Clause may provide greater rights in cases tried before juries than in bench trials.” Like Morgan, however, Cardenas says nothing about the application of the clause at sentencing, whether the proceeding is before a jury or a judge. Instead, it stands only for the unremarkable proposition that the clause applies during the guilt phase of a trial to prevent the use of incriminating out-of-court statements made by a co-defendant who has not been cross-examined, and it suggests that barring the admission of such statements is perhaps less crucial when the question of guilt or innocence is being determined by a judge, given that a judge is capable of "disregarding inadmissible extrajudicial statements implicating a defendant.” Id. at 1154.
There is a constitutionally significant distinction between a trial of the elements of an offense and the selection of an appropriate penalty from an available range once guilt has been determined, and neither this Court nor the Supreme Court has indicated that the permissible, though not constitutionally required, use of jury sentencing renders necessary the application of the Confrontation Clause to the selection decision. Furthermore, even if one were to accept the notion that because the FDPA employs jury sentencing, the Confrontation Clause should apply throughout federal capital sentencing proceedings, the notion that jury sentencing implicates greater constitutional rights does nothing to support the broader position advocated by the dissent: That is, that the clause applies to all capital sentencing proceedings, regardless of whether a jurisdiction chooses to employ jury sentencing.
Finally, several states, including Texas, allow jury sentencing in noncapital cases. See Tex Code Crim. P. Ann. art. 37.07 § 2(b); Ark. Code Ann. § 16-90-107(b)(l); Ky.Rev.Stat. Ann. § 532.055(2); Mo. Ann. Stat. § 557.036; Va.Code Ann. § 19.2-295. As we have noted at length, however, the Confrontation Clause does not apply at noncapital sentencing. The dissent does not explain why jury sentencing should result in the attachment of the confrontation right at capital sentencing even though that link-up does not exist at noncapi-tal sentencing.

. Compare, e.g., United States v. Jones, 132 F.3d 232, 241 (5th Cir.1998), aff'd, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (stating that under the FDPA, “the defendant and the government may introduce any relevant information during the sentencing hearing limited by the caveat that such information be relevant, reliable, and its probative value must outweigh the danger of unfair prejudice”) with U.S.S.G. § 6A.1.3 (providing that "[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indi-cia of reliability to support its probable accuracy”).

. Those factors are “(1) whether the expert’s theory can be or has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of a technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) the degree to which the technique or theory has been generally accepted in the scientific community.” Mathis, 302 F.3d at 460.

. See United States v. Barnette, 211 F.3d 803, 815 (4th Cir.2000) (“We need not address whether Daubert applies to sentencing hearings, because, even assuming that it does, we find the evidence meets its standard for admissibility.”); see also Flores v. Johnson, 210 F.3d 456, 464-70 (5th Cir.2000) (specially concurring, Garza, J.) (questioning the constitutionality of admitting an expert's testimony regarding future dangerousness after Dau-bert)-, cf. Tigner v. Cockrell, 264 F.3d 521, 526-27 (5th Cir.2001) (declining an invitation to hold that Daubert required the exclusion of expert future dangerousness testimony because it would constitute a new rule on collateral review).

.The language of section 3593(c) is very similar to Rule 403 of the Federal Rules of Evidence except that Rule 403 provides that evidence may be excluded if the probative *343 value is substantially outweighed by, among other things, the danger of unfair prejudice.

. To say the scope of valid sentencing evidence is broader does not necessarily signify that the form testimony may take should be looser. "The FDPA expressly supplants only the rules of evidence, not constitutional standards.” United States v. Johnson, 239 F.Supp.2d 924, 946 (N.D.Iowa 2003).

. A recent opinion by Justice Stevens confirmed the breadth and continuing viability of Barefoot. See United States v. Scheffer, 523 U.S. 303, 334, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (Stevens, J., dissenting) ("There is no legal requirement that expert testimony must satisfy a particular degree of reliability to be admissible. Expert testimony about a defendant’s ‘future dangerousness’ to determine his eligibility for the death penalty, even if wrong ‘most of the time,' is routinely admitted.") (emphasis added). No member of the Scheffer Court disagreed.

. Since our review is deferential, we need not address whether a district court could opt to exclude future dangerousness testimony on reliability grounds. We hold only that it was not an abuse of discretion to admit such testimony.

. Fields makes three final arguments which require little discussion. His claims that the testimony at issue (1) invaded the province of the jury or (2) would be "unfairly prejudicial” even if reliable have no merit. Additionally, we reject Fields’s complaint that the court abused its discretion by not articulating on the record its balance of probative value and unfair prejudice under section 3593(c). Assuming arguendo that such an articulation would be required in the context of section 3593(c), Fields’s "failure to request specifically an on-the-record articulation ... is fatal to his appeal on this point.” United States v. Fox, 69 F.3d 15, 20 (5th Cir.1995) (Rule 404(b)).

. This was recently explained, in the context of the United States Sentencing Guidelines, by the en banc Third Circuit:
None of the facts relevant to enhancements or departures under the Guidelines can increase the maximum punishment to which the defendant is exposed. The Due Process Clause thus affords no right to have these facts proved beyond a reasonable doubt. Harris [v. United States], 536 U.S. [545,] 558, 122 S.Ct. 2406, 153 L.Ed.2d 524 [(2002)] (“Judicial factfinding in the course of selecting a sentence within the authorized range does not implicate the ... reasonable-doubt component ] of the Fifth ... Amendment! ].”). This holding accords with the decisions of each of our sister circuits that has addressed this issue.
United States v. Grier, 475 F.3d 556, 566 (3d Cir.2007) (en banc) (some citations omitted, some brackets and ellipses in original).

. Insofar as Fields suggests that either Swanton or Peterson may have been inadequate because neither had tried a case under the Federal Death Penalty Act, that argument is without merit. Section 3005 makes no state/federal distinction, and the guide to Federal Death Penalty cases promulgated by the Judicial Conference expressly rejects such a distinction. See Guide to Judiciary Policies and Procedures, App. 1-1 (1999) (“Ordinarily, 'learned counsel’ should have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in state death penalty trials, appeals, or post-conviction review.”) (emphasis in original). Indeed, as a practical matter, state courts often are the only place that attorneys can gain significant capital experience. See id. at 1-10 (“Because violent felony offenses, particularly homicides, rarely are prosecuted in the federal courts, there is little opportunity for federal court practitioners to learn even the fundamentals relevant to the guilt phase defense of a federal death penalty case.”).

. Otherwise, Fields’s waiver of counsel appears to have been knowing and intelligent. In any event, Fields makes no argument to the contrary.

. See Holloway v. Arkansas, 435 U.S. 475, 484, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (stating that courts need not appoint new counsel where the risk that a conflict will materialize is "remote”); see also United States v. Exson, 328 F.3d 456, 460 (6th Cir.2003) ("The proper focus ... is on the quality of the advocacy.”); Dunn, 162 F.3d at 307 (stating that a defendant’s waiver of counsel is voluntary unless existing counsel is "constitutionally inadequate”) (emphasis added).

. Compare United States v. Creel, 158 Fed.Appx. 627, 628 (5th Cir.2004) (unpublished) (defendant’s “disagreements with counsel” did not “constitute[] good cause for him to receive a new attorney”) with Young, 482 F.2d at 995 ("A showing that appellant’s appointed attorney had disclosed confidential defense matters to the prosecutor which would damage the defense would have amounted to 'good cause’ for not proceeding to trial with the same counsel.”).

. For the first time in his reply brief, Fields argues that he accused his attorneys of misconduct, which gave rise to a conflict of interest. We will not consider this argument. Since it was not raised in Fields’s opening brief, the misconduct-accusation claim is effectively waived. See United States v. Jackson, 426 F.3d 301, 304 n. 2 (5th Cir.2005).

. Fields also suggests that the district court failed to investigate the reasons for his dissatisfaction with his attorneys before denying his request for new counsel. The record shows otherwise. As stated above, the court invited Fields to explain his qualms with his present counsel. Fields’s explanation simply did not provide good cause for new counsel.

. For example, in late 2003 Fields wrote to the court: “Defense counsel informed me of their strategy and I disagreed therefore rose a conflict .... There is a serious conflict of interest and if my Attorneys would have informed me of their strategy sooner, this motion would have reached you sooner.”

. "The 'CSI effect' is a term that legal authorities and the mass media have coined to describe a supposed influence that watching the television show CSI: Crime Scene Investigation has on juror behavior. Some have claimed that jurors who see the high-quality forensic evidence presented on CSI raise their standards in real trials, in which actual evidence is typically more flawed and uncertain." Tom R. Tyler, Viewing CSI and the Threshold of Guilt: Managing Truth and Justice in Reality and Fiction, 115 Yale L.J. 1050, 1050 (Mar.2006). Professor Tyler's article explains that the existence of a “CSI effect” is plausible but has not been proven empirically.

. Fields also gestures to other instances where the Government allegedly elicited inadmissible prior bad acts evidence. His briefing on this issue is nothing more than "see also” citations and descriptive parentheticals. Since each allegation of misconduct must be viewed individually and since context is critical, see Insaulgarat, 378 F.3d at 461, these matters are inadequately briefed. Consequently, we will not consider them. See United States v. Williams, 400 F.3d 277, 283 (5th Cir.2005).

. Fields does not point to any "holes” in the prosecution’s case on the other counts. Indeed, as to the escape count, Fields admitted his guilt before the jury.

. Fields also argues that the trial errors cumulatively infected his sentencing by creating an unacceptable risk that the jury imposed a death sentence "under the influence of passion, prejudice, or any other arbitrary factor.” 18 U.S.C. § 3595(c)(2)(A). Having rejected nearly all of Fields’s claims of trial error, we find that any errors that may have occurred do not cumulatively warrant reversing his sentence, especially in light of the district court’s instruction that the jury must avoid the influence of "passion, prejudice or sympathy” and base its sentence upon the evidence. We also decline Fields’s invitation to exercise our supervisory authority to reverse his sentence.